THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. JACK NEWTON, PETITIONER-APPELLANT.

Argued December 6, 1954—Decided January 24, 1955.

*Mr. Francis M. Seaman* argued the cause for appellant.

*Mr. Eugene T. Urbaniak* argued the cause for respondent (*Mr. Grover C. Richman, Jr.,* Attorney-General of New Jersey, attorney).

The opinion of the court was delivered by

WILLIAM J. BRENNAN, JR., J.   Under the 1950 Act for the Treatment of Sex Offenders, *N. J. S. 2A*:164–3 *et seq., L.* 1950, *c.* 207, *p.* 454, a judge may not impose a prison sentence upon a person convicted of rape, carnal abuse, sodomy, open lewdness, indecent exposure or impairing the morals of a minor, or of an attempt to commit any such offense, if the Diagnostic Center reports, from an examination of the offender, that his conduct was characterized by a pattern of repetitive, compulsive behavior, and either violence or an age disparity from which it appears that the victim was under the age of 15 years and the offender was an adult aggressor.   In such case it is the duty of the court, upon recommendation of the Diagnostic Center, to submit the offender to a program of specialized treatment for his mental and physical aberrations.   The program may entail probation conditioned on his receiving out-patient psychiatric treatment, or he may be committed to an institution designated by the Commissioner of Institutions and Agencies for treatment, and upon release shall be subject to parole supervision. *N. J. S. 2A*:164–6.

The question here is whether the Commissioner of Institutions and Agencies has the authority under the Sex Offender Act to transfer to the State Prison at Trenton a convicted sex offender who was committed by the sentencing judge, upon the Commissioner's designation, to the State Hospital at Marlboro.

Newton was convicted in Middlesex County Court of the crime of carnal abuse and was committed to the State Hospital at Marlboro in compliance with the act.   He did not respond to individual and group therapy techniques applied at the Hospital and when after 14 months a special classi-

fication review board, constituted under *N. J. S.* 2*A*:164–8, determined that he was "without psychosis, mental deficient, moron," with an I. Q. of 70, the Commissioner transferred him to the State Prison. The board had recommended that he be transferred to the New Lisbon Colony for Feebleminded Males, but that institution has a waiting list of upwards of 700 and there is no room for Newton there at this time.

Newton sought and was denied a writ of *habeas corpus* by the Middlesex County Court and the Appellate Division affirmed, 30 *N. J. Super.* 382 (1954). We granted certification on Newton's petition.

█ Newton was not entitled, in any event, to his immediate release from custody, and we might sustain the denial of the writ of *habeas corpus* on that ground, *In re Kershner,* 9 *N. J.* 471 (1952). However, both lower tribunals based their judgments upon holdings that the transfer was proper within the authority given the Commissioner by *N. J. S.* 2*A*:164–7 providing:

"The commissioner, in his discretion, is hereby authorized and empowered to arrange for the transfer of such person to or from any institution within the jurisdiction of the department for the purpose of providing for the needs and requirements of such person according to the individual circumstances of the case."

In the light of the importance of the question, we have concluded to state our reasons for our agreement with this view. Both the State Hospital at Marlboro and the State Prison at Trenton are "institutions within the jurisdiction of the department," *R. S.* 30:1–7.

█ It is true that if the report of the Diagnostic Center had been that Newton's conduct was not characterized by a pattern of repetitive, compulsive behavior and neither violence nor age disparity was indicated, the trial judge, under *N. J. S.* 2*A*:164–9, would have been free to impose a prison sentence, in which case any sentence to the State Prison at Trenton would have been for fixed minimum and maximum terms, *N. J. S.* 2*A*:164–17, against which Newton would have been entitled to remission by way of commutation time

for good behavior and for work performed, *R. S.* 30:4–140, and to consideration for release on parole (unless he be a multiple offender subject to *R. S.* 30:4–123.12) after serving his minimum sentence less commutation time or one-third of his fixed maximum sentence without regard to commutation time, whichever occurred sooner, *R. S.* 30:4–123.10. But, having originally been committed to the State Hospital at Marlboro pursuant to *N. J. S.* 2A:164–6 of the Sex Offender Act upon the affirmative findings of the Diagnostic Center, no minimum term was or could be ordered, *N. J. S.* 2A:164–6, he is not entitled to remission of sentence. by way of commutation time but only to monetary compensation for work performed, and, subject to the provisions of the Sex Offender Law, he may be confined for the maximum period provided by law for his crime and can be considered for parole only if and when the special classification review board recommends to the State Parole Board that he is capable of making a social adjustment in the community, *N. J. S.* 2A:164–8. Thus, it may be that Newton will remain in the State Prison for the maximum of the term fixed by law for his crime, *N. J. S.* 2A:138–1, unless an abuse of discretion by the Commissioner in detaining him there rather than in another institution under the department's jurisdiction can be established in an appropriate proceeding seeking review of the Commissioner's action. No point is made by Newton that the Commissioner's discretion was abused, and we reserve for a proper case the definition of the permissible considerations which may control the exercise of the Commissioner's transfer power. It will be noted that under *N. J. S.* 2A:164–8 it is made the "duty of the chief executive officer of any institution wherein such a person is confined to report in writing at least semiannually to the commissioner concerning the physical and mental condition of such person with a recommendation as to his continued confinement or consideration for release on parole."

The nub of the argument on Newton's behalf is that the Commissioner's transfer power is limited to transfers between

*hospitals* under the department's jurisdiction, this upon the contention that it is implicit in the Sex Offender Law that a person found by the Diagnostic Center to require specialized treatment is a "sick" man to be treated as such and not to be confined in a penal institution. The argument is summarized in the brief as follows:

"It would not be oversimplification to state that the intent of the Legislature, in cases of the instant character, was this: If the offender was sick, he belonged in a hospital or under out-patient care; and not in prison, ever. If he was not sick, there was only one institution in which he should be confined: prison. He should be sent to prison only if he was not sick, and only by the *judge*, on a sentence. The character of the place of his confinement, *i. e.*, hospital or correctional, is indicated inexorably by the report of the diagnostic center, in the very beginning. If he was sick, he was not an imprisonable criminal, but a patient, and did not belong in the state prison, regardless of whether any type or degree of therapeutic facilities existed there, for the treatment of his condition. The Legislature certainly did not prescribe imprisonment for a sick man, but treatment. The word runs repeatedly throughout the enactment. If he was sent to prison, even under the lip-service of treatment, it is still imprisonment and punishment of a sick man, no matter how sugar-coated his durance vile may be. The Legislature did not intend punishment for him, but mental and physical rehabilitation in an effort to arrest and cure his repetitive and compulsive predilection toward the sex offense of which he was convicted."

To the contrary, we think the scheme of the Sex Offender Law is this: If the sex offender whose conduct reveals a pattern of repetitive, compulsive behavior may not in the judgment of the Diagnostic Center safely be placed on probation by the sentencing judge in the first instance, his confinement for the maximum period provided by the law for his crime is essential for the protection of society unless during such period the application of such psychiatric or medical remedies for the relief of his aberrations as the State is able to provide results in a recommendation by a special classification review board to the Parole Board that he is capable of making an acceptable social adjustment in the community and he is released under parole supervision. However, the hard fact is that in the present reach of psychiatric and medical knowledge in the field and under the now existing handicaps

of insufficient facilities and small professional staffs, results of treatment are often disappointing. The express broad power of transfer among all institutions under the Commissioner's jurisdiction, correctional or not, is recognition that, while the interests of both society and the convicted offender require that every reasonable effort be made to aid the offender to make an acceptable social adjustment, society's greater interest demands that he be confined for so long during the maximum period as remedies to that end prove unavailing and in such institutions under the Commissioner's jurisdiction as from time to time may be appropriate in the circumstances of the particular case.

The important differences as to commutation time and parole consideration which result from affirmative clinical findings of the Diagnostic Center are not the only evidence that this is the legislative scheme. The conclusion is buttressed by the fact that the 1950 statute embodies the recommendations of the Commission on the habitual sex offender created by Senate Joint Resolution No. 7 adopted March 10, 1949. Composed of legislators and members appointed by Governor Driscoll "with special regard for their training, experience and ability in the field of psychiatry, psychology, penology and allied branches of the sciences related to the prevention, treatment and cure of habitual sex offenders," this Commission, after a year's study of the operations of the statutes of other states and consultations with hundreds of psychiatrists and others learned in the subject, submitted a comprehensive and admirably documented report of its findings supporting its recommendations. When legislation is preceded "by investigation conducted by special committees of the legislature * * * necessary for the study of highly important complex social problems and the drafting of proper statutory remedies therefor * * * the courts have properly turned to these reports for aid in construing statutes enacted in accord with the committee's recommendations. * * * the use of these and similar materials is justified by the fact that they were brought

to the attention of the legislature and by the probability that it intended to adopt the views embodied therein when it enacted the committee's recommendations into law." 2 *Sutherland, Statutory Construction* (*3rd ed. Horack* 1943), *sec. 5006, pp.* 491–493; *cf. Port of New York Authority v. Weehawken,* 14 *N. J.* 570 (1954).

The Commission's report recommended that legislation be limited to the handling of "the sex offender who is a real menace to the community" (*p.* 7) and be "designed only as a *supplement* to the traditional body of criminal law" (*p.* 8) and reflect recognition that "As compared with other types of psychological and constitutional abnormality, we are peculiarly at a loss in the handling of abnormal sex offenders. Methods of effective treatment have not yet been worked out. \* \* \* Most psychiatrists agree that psychotherapy of some sort should be given to sex offenders, but they are in agreement that professional staffing is not available to perform this work and that an unknown but undoubtedly very high percentage of deviates would not respond to such treatment. \* \* \* The point should be stressed that commitment of a sex deviate to a state mental hospital *does not imply clinical treatment.* These institutions lack the space, the personnel, the treatment methods, or even the desire to handle deviated sex offenders who are non-psychotic." (*pp.* 15–16) And, further, at *pages 32–33*:

"Of even greater significance perhaps than the lack of space and of specialized institutions to receive sex psychopaths is the lack of any real treatment efforts to cure or rehabilitate these offenders after they are committed. Their 'treatment' is almost purely custodial. An underlying difficulty is the lack of psychiatric knowledge today of methods that can be employed effectively to deal with psychopathic offenders. Such treatment modalities as are considered to be of some potential value—such as intensive psychotherapy, group therapy and psychiatric counsel—are generally unavailable for the psychopath in the state mental hospital. Some of these institutions have used shock treatment and surgery to a limited extent on the sexual offender, but there appears in the reports no reason to believe that these methods are effective on such cases. Hospital administrators generally indicate that they are completely impotent to provide even experimental treatment efforts for their sex psychopaths. So far as the Commission's Advisor could discover, intensive

treatment efforts have been tried under the sex statutes only at St. Elizabeth's Hospital in the District of Columbia. The work there is being carried on experimentally and with only a very small number of cases.

Experience with hospital commitment under these laws raises a very important policy question: Is there any value in providing for diagnosis of a novel category of mental aberration and for commitment to psychiatric hospitals if these patients are then to be held for ·prolonged periods without receiving any special treatment? What virtue does such a procedure possess over the more traditional method of sentence to a correctional institution? If the purpose be mainly to extend the period of custody, this could be done as well—and probably better—in the penal system. As one prominent New Jersey psychiatrist has pointed out, however, it is a travesty to assume that by mere custodial hospitalization a state can solve either the purposes of rehabilitation or of community protection."

The Commission, upon these considerations, expressed itself as opposed to the type of law enacted in many states under which it is mandatory that "Commitment of the sex deviate after a finding is to a mental hospital" and stated its preference for a law under which "either a penal or mental facility may be designated by the Commissioner of Institutions" (p. 32). The Commission's recommendations 10 and 13(b), at pages 9 and 10 of the report, accordingly were that the "Treatment Program * * * upon recommendation of the Diagnostic Center, shall include one or more of the following measures:

"(a) Probation with out-patient psychiatric treatment.

(b) Commitment to a specialized facility for intensive psychiatric treatment, followed by parole supervision * * * when they are believed capable of making an acceptable social adjustment.

(c) Commitment for care to a state mental hospital, followed by parole supervision * * * when they are believed capable of making an acceptable social adjustment.

(d) *Commitment to a correctional institution, followed by parole supervision * * * when they are believed capable of making an acceptable social adjustment.*" (Emphasis supplied.)

These recommendations were already embodied in an interim 1949 statute adopted simultaneously with the creation of the Commission, L. 1949, c. 20, p. 65. The Commission noted that that law provided that "either a penal or mental

facility may be designated by the Commissioner of Institutions" (p. 32 of the report). This was the case, as to original commitment by the judge, under section 6 which provided "the judge shall order the commitment of such person to an appropriate institution to be designated by the Department of Institutions and Agencies," and, as to commitment upon transfer thereafter, under section 7, which, in phraseology identical with that of *N. J. S. 2A*:164–7 of the 1950 act, empowered the Commissioner "in his discretion * * * to arrange for the transfer of such person to or from any institution within the jurisdiction of the Department of Institutions and Agencies for the purpose of providing for the needs and requirements of such person according to the individual circumstances of the case." The Legislature was, of course, familiar with its Commission's interpretation of the 1949 statute and plainly adopted it when enacting the same provisions in the 1950 statute which replaced the 1949 law. *Sutherland, supra.*

Affirmed.

HEHER, J. (dissenting). Newton is confined in the State Prison at Trenton, not under sentence for a maximum-minimum term sanctioned by the State's limited indeterminate sentence law, with commutation credits for good behavior and work performance, parole eligibility, and other ameliorating benefits designated to inculcate the resolve for rehabilitation as a primary adjunct of the punitive process, but by the edict of the State Commissioner of Institutions and Agencies to serve in the State's maximum-security prison, it is now held, the "maximum of the term fixed by law for his crime," carnal abuse, "not entitled to remission of sentence by way of commutation time but only to monetary compensation for work performed," and without the right to the parole eligibility which is a redemptive mechanism basic to all sentences of imprisonment for crime, but to consideration for parole, *N. J. S. 2A*:164–8, "only if and when the Special Classification Review Board recommends to the State Parole

Board that he is capable of making a social adjustment in the community," and so Newton will be confined to the State Prison for the maximum term fixed by the law for the crime of which he was convicted, *N. J. S.* 2A:138–1, unless an abuse of discretion by the Commissioner in detaining him there rather than in another institution under the department's jurisdiction can be established in an appropriate proceeding seeking review of the Commissioner's action.

The action thus taken is not, I would suggest, within the purview of the act for the "treatment" of sex offenders, *L.* 1950, *c.* 207; *L.* 1951, *c.* 44; *N. J. S.* 2A:164–3; and, at all events, there is in fact and in law imprisonment of Newton without the constitutionally secured due process of law. He is a prisoner in the State Prison, not in virtue of a commitment by the sentence of a judge in the court in which the conviction was had, but by the action of state administrative officer who in justification now pleads the want of treatment facilities adequate to serve the imperative statutory policy of curative treatment of habitual sex deviates.

Judge Kalteissen did not sentence Newton to prison, but ordered his commitment to the "Diagnostic Center for examination," as required by *N. J. S.* 2A:164–3. Upon completion there of the "physical and mental examination" directed by section 4, a "written report of the results" was submitted to the court, and there being a determination "through clinical findings" that the "offender's" conduct was of the character delineated in section 5, and a "recommendation" to that end by the Diagnostic Center, it became the peremptory "duty" of the court "to submit the offender to a program of specialized treatment for his mental and physical aberrations"; and he was accordingly "committed" by Judge Kalteissen "to the New Jersey State Hospital at Marlboro, N. J.," on April 18, 1952, and from there he was transferred by the Commissioner of Institutions and Agencies to the State Prison on June 19, 1953. If the findings of the Diagnostic Center, section 9, are *contra*, it is incumbent on the judge to "impose sentence on such person in the manner provided by law."

The statute, section 5, considers Newton, not as one sentenced to expiate a crime in a penal institution, but rather as an "offender" in need of "specialized treatment for his mental and physical aberrations." The requisite showing being made by the clinical findings of the Diagnostic Center, sections 6, 8, the committing judge could (a) place Newton on probation conditioned on "out-patient psychiatric treatment in the manner to be prescribed in each individual case," or (b) commit him to an "institution" to be designated by the Commissioner of Institutions and Agencies "for treatment," and eventual release "subject to parole supervision" when it shall be made to appear to the State Parole Board, "after recommendation by a special classification review board appointed by the state board of control of institutions and agencies," that he is "capable of making an acceptable social adjustment in the community." But the Commissioner is enjoined, section 7, to arrange for the "treatment" of the offender in one of the "institutions" under the jurisdiction of the department which in his judgment is "best suited to care for the needs of such person," and to transfer such person to or from any "institution" within the jurisdiction of the department "for the purpose of providing for the needs and requirements of such person according to the individual circumstances of the case." In such cases, section 6, there shall be no specified minimum "period of detention," but "in no event shall the person be confined or subject to parole supervision for a period of time greater" than that provided by law for the crime of which he was convicted. And there is also provision, section 13, for the voluntary "treatment" in an institution designated by the Commissioner of a person who believes himself "to be suffering from a physical or mental condition which may result in sexual trends dangerous to the welfare of the public."

It seems to be conceded that the State Prison does not have the "specialized treatment" facilities contemplated by the statute, and requisite to fulfill the legislative policy of rehabilitative medical and psycho-therapy, in a field where the rate of recidivism is generally low. That would seem

to be a matter of common knowledge. Indeed, it is quite frankly avowed that compliance with the recommendation made by the special classification review board that Newton be transferred to the New Lisbon Colony for Feeble-minded Males was not had because that institution had a waiting list of upwards of 700.

But however this may be, there is no warrant whatever for the incarceration of this man in the State Prison. The Legislature plainly had in view for persons of this class a radically different social policy and rule of action, one of specialized regenerative treatment, physical and psychological, for which the punitive atmosphere and associations are ill-adapted and deterrents to effective treatment, not to mention the circumstances of maladjusted mind and body as mitigating moral guilt; for the others, it distinctly provided, *section* 2A:164–9, for "sentence  *  *  * in the manner provided by law." The Commissioner's power of transfer is so conditioned by the imperative terms of the statute. There is no provision for the administrative transfer of one so confined to a correctional institution, much less the State's maximum-security prison. The curative and rehabilitative treatment is not to be administered in the penal system. The essential policy to be served is the key to the understanding of the statute; the course taken here, I submit, subverts the genius and spirit of the enactment.

I would reverse the judgment and remand the cause for proceedings conforming to the foregoing conception of the legislative design.

Mr. Justice BURLING joins in this opinion.

*For affirmance*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD, JACOBS and BRENNAN—5.

*For reversal*—Justices HEHER and BURLING—2.