STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. HAROLD L. WINGLER, DEFENDANT-APPELLANT.

Argued September 4, 1957—Decided October 21, 1957.

162

*Mr. Lawrence A. Carton, Jr.,* argued the cause for the appellant.

*Mr. Eugene T. Urbaniak,* Deputy Attorney-General, argued the cause for the respondent (*Mr. Grover C. Richman, Jr.,* Attorney-General of New Jersey, attorney).

The opinion of the court was delivered by

Jacobs, J. This is an appeal from a judgment of the Appellate Division affirming an order of the Monmouth County Court denying an application for a writ of *habeas corpus.*

On March 17, 1952 the defendant Harold L. Wingler was found guilty on an indictment which charged him with

carnal abuse (*N. J. S.* 2*A*:138–1), open lewdness (*N. J. S.* 2*A*:115–1), and attempting to impair the morals of a child under the age of 16 (*N. J. S.* 2*A*:85–5; *N. J. S.* 2*A*:96–3). In accordance with *N. J. S.* 2*A*:164–3, Judge Knight committed him to the Diagnostic Center for a complete mental and physical examination. On April 15, 1952 Dr. Brancale, Director of the Diagnostic Center, forwarded a report stating that the defendant had a severe psychiatric disturbance and recommending that he be placed under the Sex Offender's Act and committed to a State Hospital for further observation. On April 16, 1952 Judge Knight wrote to Commissioner Sanford Bates of the Department of Institutions and Agencies, advising that the defendant had been convicted of one or more of the offenses enumerated in *L.* 1950, *c.* 207, as amended by *L.* 1951, *c.* 44 (now *N. J. S.* 2*A*:164–3), that he had been given a complete examination as required by the statute, and that it appeared from the Diagnostic Center's report that the defendant came within the terms of the statute requiring his commitment to an appropriate institution to be designated by the Department of Institutions and Agencies. Judge Knight requested the name of the institution and Commissioner Bates recommended the New Jersey State Hospital at Marlboro. On May 9, 1952 Judge Knight sentenced the defendant "to the New Jersey State Hospital at Marlboro for an indeterminate period."

The defendant was admitted to the State Hospital at Marlboro on May 12, 1952. Dr. Palsson's report, dated May 13, 1952, stated that the defendant was uncooperative, had refused to adhere to ward routine and had threatened to leave the hospital. Dr. McCreight's report, dated June 23, 1952, pointed out that the defendant had been "uncooperative, hostile, and defensive in his attitude toward physicians," and recommended that he be transferred to the Men's Disturbed Building for security reasons. On June 25, 1952 Dr. Frantz reported that repeated efforts had been made to test the defendant with no success, and the defendant had refused to enter into any "testing, counselling or therapeutic situation." The hospital reports dated July 3, 1952 indicated

that the defendant was "resistive and assaultive," had complained about shock treatments, had stated that he would "kill anyone that came near him with any ideas of giving him shock," and had threatened to "kill the doctor that attempted to give it to him." On July 7, 1952 Dr. Gordon, Medical Director at Marlboro, wrote to Dr. Bixby, Director of Correction, advising that the defendant had been diagnosed as "Without Psychosis, Psychopathic Personality with Pathological Sexuality," had displayed an "assaultive attitude," and was "very antagonistic, aggressive, and hostile." Dr. Gordon recommended that the defendant be transferred to a penal institution. On July 16, 1952 Dr. Bixby wrote to Dr. Gordon that he could not, at that time, see his way clear "to recommending his transfer to a correctional institution." However, on July 16, 1952 the defendant was transferred, by order of Commissioner Bates, to the Vroom Building of the Trenton State Hospital.

On November 26, 1952 the Special Classification Review Board, established under *N. J. S.* 2*A* :164–8, submitted a report of the defendant's first consideration for parole release and recommended further review in May 1953. Early in March 1953 there was a threatened disturbance in the Vroom Building. Dr. Magee advised Dr. Bixby, by letter dated March 2, 1953, that it appeared that a fairly well-organized plan had been worked out to stage a demonstration and that the plan had been "thought out by a number of the patients, 7 of whom were non-psychotic sex offenders." He named the seven, including the defendant, and requested that "they be transferred to the State Prison for safekeeping." On March 3, 1953, by order of Commissioner Bates, the defendant was transferred to the New Jersey State Prison at Trenton.

On March 25, 1953 the defendant was examined by the prison psychologists. They reported that it appeared that they were dealing with "an extremely primitive and inadequate personality, perhaps a simple schizophrenic." They noted the defendant's statement that he "would a been in the riot at the State Hospital if it had a got started," and they expressed the view that "his chances for staying out of

trouble when released are slim." On May 11, 1953 the defendant received his second consideration for parole release. Mr. Korn, Director of Education and Counselling, noted that the defendant's sexual drive was "compulsive in character," and that he was "confused and threatened by sexual impulses he can neither acknowledge nor control—he is not to be considered in the category of the wilfully deliberate and self-controlled sex offender." The Special Classification Review Board recommended further review in November 1953. Its report quoted the following "Institution Recommendation":

"Serious nature of the offense, short period served, the fact the inmate is still highly neurotic and compulsive and is unable to cope with his own impulses, lack of insight, the fact he rationalizes his avoidance of all blame through his hostility toward the institution by refusing to work. His psychiatric condition precludes release to the community at this time."

The defendant's third consideration for parole release was on November 16, 1953. Mr. Korn reported his efforts to establish a therapeutic relationship with the defendant and indicated that "a tenuous relationship" was being built; he stated that it was impossible to offer a prognosis since "everything depends on the character and strength of the slow-developing relationship with the counsellor." The Board recommended further review in May 1954. On April 13, 1954 Commissioner Bates wrote to Dr. Bixby requesting that the classification committee at the Prison study the defendant's case and give its recommendation as to whether the defendant "is now suitable for transfer to Bordentown." This matter was taken up during the defendant's fourth consideration for parole on May 10, 1954. At that time the defendant said he wanted neither a parole nor a transfer to Bordentown, but that he did want to go to the State Hospital at Marlboro. Dr. Jackson reported that the defendant was "too irresponsible and confused to be at large," and the prison classification committee opposed the defendant's transfer to Bordentown. The committee pointed out that the defendant had threatened to escape from Borden-

town if transferred there and that in view of "his impulsivity and the possibility of an outburst of violence" he would present "a definite threat to the reformatory."

The defendant's fifth consideration for parole release was on November 15, 1954. Dr. Jackson reported that the defendant was not cooperative and had made "a threat of violence to Dr. Brancale when he gets out." The sixth consideration was on May 16, 1955. Dr. Jackson reported that "he is obviously an unsuitable case for immediate release to the community but presents an extreme problem as to establishment of helpful personal and professional relationships." At the time of the seventh consideration on November 14, 1955, the defendant was in segregation and consequently was not interviewed by the classification committee. The Board recommended further review in May 1956 and requested a complete psychiatric examination of the defendant. On May 18, 1956 the defendant was examined by Dr. Revitch, a psychiatrist attached to the Diagnostic Center. Dr. Revitch expressed the view that the defendant would make a "better adjustment in prison than in the hospital." The eighth and ninth considerations for parole review resulted in recommendations by the Board for further review at later designated dates. On November 9, 1956 Mr. M. Olive, counsellor at the Prison, addressed a memorandum to Dr. Revitch pointing out that the defendant's record indicated various deviant activities and suggesting that the defendant might "respond more appropriately to the therapeutic environment of a hospital." Mr. Olive requested that Dr. Revitch see the defendant "for consideration for possible transfer to the State Hospital." On November 19, 1956 Dr. Revitch examined the defendant. He reported that the defendant was in great need of psychotherapy, that some kind of casual relationship could be established, and that he would call from time to time for meetings with the defendant. His specific recommendations were that the defendant be given an assignment in which he could move around and that there be occasional psychotherapeutic interviews between him and the defendant.

In April 1956 the defendant applied for a writ of *habeas corpus*. His application was denied and he appealed to the Appellate Division which affirmed the denial on January 2, 1957. Thereafter he was granted leave to appeal as an indigent person and counsel was assigned to file a brief and argue on his behalf. In this court he seeks a reversal and an order returning him "to the lower court for re-sentence." In his brief he contends: (1) that the Sex Offender Act (*N. J. S. 2A*:164–3 *et seq.*) as interpreted in *State v. Newton,* 17 *N. J.* 271 (1955), denies to him the equal protection of the laws, and (2) that he is entitled to a hearing to determine whether his transfer to the State Prison involved an abuse of discretion. The State's brief denies these contentions and, in addition, asserts various preliminary procedural points which should not, however, be permitted to delay the just determination of the important substantive issues presented.

Much has already been written by members of the legal and medical professions about the sex offender and his treatment. See *e. g., Ploscowe, Sex and the Law* (1951); *Karpman, The Sexual Offender and His Offenses* (1954); *Reinhardt, Sex Perversions and Sex Crimes* (1957); *Sexual Offences (Radzinowicz ed.* 1957). Much more remains to be written, for the misconceptions are quite numerous and the psychiatric and medical knowledge and equipment are quite limited. See *Guttmacher, Sex Offenses* (1951); *Final Report of the Department of Mental Hygiene, California Sexual Deviation Research* (1954); Tappan, "Some Myths about the Sex Offender," 19 *Fed. Prob.* 7 (*June* 1955); *Ellis & Brancale, The Psychology of Sex Offenders* (1956).

The problems raised by the sex offender are part and parcel of the larger issues presented in the custody and treatment of all criminals whose rehabilitation is sought for their return to society as law-abiding and useful citizens. But because of their particularly abhorrent nature, sex offenses involving force or age disparity have brought forth the most insistent public demands for the institutionalization and treatment of abnormal sex offenders until they may safely

be released. During the past quarter-century almost half the states have adopted enactments which specially regulate sex offenders. These enactments are commonly known as sex psychopath statutes. New Jersey's first enactment was *L.* 1949, *c.* 20, which prescribed mental examinations for sex offenders. Whenever the examination disclosed that the violator suffered from an abnormal mental illness which caused the commission of his offense, it became the duty of the court to commit the violator to an institution, designated by the Department of Institutions and Agencies, for a term not to exceed the maximum provided by law. The Commissioner of the Department of Institutions and Agencies was authorized to transfer the violator from institution to institution "for the purpose of providing for the needs and requirements of such person according to the individual circumstances of the case." The Legislature directed that no statutory provision relating to remission of sentence "by way of commutation time for good behavior and for work performed" shall be applicable and that probation or parole shall not be granted until the Commissioner certifies that the violator has "recovered sufficiently from his or her mental illness to make it reasonably certain that repetition of sex offenses is unlikely."

By Joint Resolution approved April 11, 1949, a Commission was created to determine whether a new statute should be enacted "to make possible the more adequate scientific treatment of the habitual sex offender or sex deviate." The Commission engaged Dr. Tappan as its Technical Consultant and under date of February 1, 1950 submitted its comprehensive Report and Recommendations. It referred to legislative and administrative experiences in other states and suggested that a wholly new enactment be adopted providing for the treatment of persons convicted of designated sex offenses where it is found that their conduct was characterized by "(a) a pattern of repetitive-compulsive behavior *and* (b) violence *or* (c) an age disparity between a victim (under the age of 15) and the adult defendant-aggressor." *Report and Recommendations of the Commission*

*on the Habitual Sex Offender* 9 (1950). It suggested that (apart from instances where the defendant is placed on probation with out-patient psychiatric treatment) the violator be committed for treatment to a mental or correctional insitution designated by the Commissioner of Institutions and Agencies for release when the violator is believed capable of making "an acceptable social adjustment," but in no event beyond the maximum term prescribed by law for the crime of which he was convicted. In the course of its discussion of a "Program of Treatment and Prevention" the Commission made the following significant comment:

"Correctional institutions with active programs should be employed for those offenders who require custody against escape but who display no such serious psychological disturbances as to require specialized treatment in a psychiatric facility. It appears that many cases that today are sent to mental hospitals under the sex laws of various states would have a better prognosis if they were confined with other criminals rather than with psychotics."

On June 8, 1950 the Governor approved *L.* 1950, *c.* 207 (*N. J. S.* 2A:164–3 *et seq.*) which, for the most part, embodies the recommendations of the Commission. Section 5 of that enactment provides that when a sex violator is committed the Commissioner shall arrange for his treatment in one of the institutions within his jurisdiction which, in his judgment, is best suited to care for the violator's needs, and that the Commissioner may order a transfer to any institution within his jurisdiction for the purpose "of providing for the needs and requirements" of the violator "according to the individual circumstances of the case." *N. J. S.* 2A:164–7. Judge Ploscowe, in his discussion of the various state enactments, pointed out that "certain statutes like those of Illinois, Michigan, California, and New Jersey make it possible to confine sex psychopaths either in state hospitals or in penal or correctional institutions." *Ploscowe, supra,* at *p.* 235. The recent holding by this court in *State v. Newton, supra,* was to the same effect. There we upheld the Commissioner's action in transferring a defendant from a State Hospital to the State Prison, both being institutions within his jurisdiction.

*R. S.* 30 :1–7. Despite pointed editorial criticisms (78 *N. J. L. J.* 152 (1955) ; 9 *Rutgers L. Rev.* 567 (1955)) and the adoption of several recent amendments to the Sex Offender Act (*L.* 1957, *c.* 25 ; *L.* 1956, *c.* 37 ; *L.* 1954, *c.* 245 ; *L.* 1954, *c.* 151), the Legislature has not moved to narrow the sweep of the transfer provision and we find no occasion for departing from our holding in *Newton.* While the Commissioner's broad transfer authority should be exercised with deliberate caution, the record before us in the instant matter indicates that there may well be compelling situations where the Commissioner has little or no practical alternative but to transfer the violator from a State Hospital to the State Prison where he will receive the avialable psychiatric and medical attention suitable "to the individual circumstances of the case." *L.* 1950, *c.* 207, § 5 ; *N. J. S.* 2A :164–7. A departmental report dated December 17, 1956 and addressed to Dr. Bixby discloses that after the adoption of the Sex Offender Act, 438 violators were committed ; 234 of them were released, 11 escaped, 8 died and 185 remain in confinement. Of the 185 in confinement, 32 were transferred from hospitals to correctional institutions under circumstances asserted by the State to be comparable to those attending the defendant's case.

In *State v. Newton, supra,* no constitutional objections to the Sex Offender Act were advanced by the defendant. Courts in other jurisdictions have found little difficulty in sustaining their acts even though they may lack some of the individual safeguards incorporated into New Jersey's carefully prepared legislation. See *People v. Chapman,* 301 *Mich.* 584, 4 *N. W.* 2d 18 (1942) ; *In re Moulton,* 96 *N. H.* 370, 77 *A.* 2d 26 (1950) ; *People v. Sims,* 382 *Ill.* 472, 47 *N. E.* 2d 703 (1943) ; *Ex parte Keddy,* 105 *Cal. App.* 2d 215, 233 *P.* 2d 159 (1951), and the cases collected in Annotation "Statutes Relating to Sexual Psychopaths," 24 *A. L. R.* 2d 350 (1952). In the *Chapman* case the prosecuting attorney filed a petition to have the defendant declared a "criminal sexual psychopathic person" under the terms of the Michigan statute. [*Comp. Laws Supp.* 1940, § 6991–1 *et seq.*] After hearing, the circuit court granted the petition and committed

the defendant "to the State hospital commission to be confined in an appropriate institution under the jurisdiction of either the state hospital commission or the department of corrections until such person shall have fully and permanently recovered from such psychopathy." In sustaining the order, the Supreme Court of Michigan rejected the defendant's contention that his constitutional rights had been infringed. It may be noted that unlike New Jersey's act, the Michigan statute did not contemplate a precedent criminal conviction nor did it prescribe a fixed maximum term of confinement. In *In re Kemmerer*, 309 *Mich*. 313, 15 *N. W. 2d* 652 (1944), *certiorari denied, Kemmerer v. State of Michigan*, 329 *U. S.* 767, 67 *S. Ct*. 129, 91 *L. Ed*. 660 (1946) the defendant, after having been adjudged to be a criminal sexual psychopath within the Michigan statute, was sent to Ionia State Hospital and was later transferred to the State Prison. He obtained a writ of *habeas corpus* which was dismissed by the Supreme Court of Michigan in an opinion which said, in part:

"Petitioner further alleges that he is confined to Jackson Prison and the sole distinction between his status and that of an ordinary convict is that he is called a 'visitor' in accordance with Act No. 165, *supra*, and that he is kept in a separate cellblock exclusively used for criminal sexual psychopathic persons. He claims that his 'visit' has been prolonged and he is asking to have it curtailed. The record indicates that the petitioner is an unfortunate person and, until cured, is unfit to enter society, and that he should be institutionalized until it is both safe for him and society that he be released. He alleges that he is not receiving proper care although the prison psychiatrist evidently visits him. He is entitled to proper care such as his condition and the good of society demands. If he is not receiving it and is suffering any unusual punishment, he can always present a petition for *habeas corpus* preferably to the circuit court of Jackson County where proper and full inquiry can be made into the facts. It is not within our province to prescribe the treatment that should be accorded petitioner. It must be borne in mind that he is not being punished, that he is an unfortunate psychopath and that he is entitled to such treatment as his condition requires." 15 *N. W. 2d*, at *page* 653.

See also *Kemmerer v. Benson*, 165 *F. 2d* 702 (6 *Cir*. 1948), *certiorari* denied 334 *U. S*. 849, 68 *S. Ct*. 1500, 92 *L. Ed*. 1772 (1948).

In *State ex rel. Volden v. Haas,* 264 *Wis.* 127, 58 *N. W. 2d*
577 (1953), the defendant was convicted of carnal knowledge
and abuse. The Wisconsin statutes [*St.* 1951, § 340.485]
provide that where a person is convicted of carnal knowledge
and abuse he shall be committed to the department of public
welfare for "a presentence social, physical and mental exam-
ination," and if the department recommends specialized treat-
ment for his mental and physical aberrations, the court shall
either put him on probation for out-patient treatment or com-
mit him to the department for confinement and treatment.
The defendant was committed to the department and obtained
a writ of *habeas corpus* alleging deprivation of his constitu-
tional rights. The writ was dismissed and this was affirmed
by the Supreme Court of Wisconsin in an opinion which
stressed the fact that the defendant had been lawfully con-
victed of crime and that the only issue was the propriety of
his sentence. The court found no constitutional infirmity in
Wisconsin's statutory plan, somewhat comparable to New
Jersey's, which authorizes the commitment of the convicted
sex violator to a state department, vested with statutory
powers for his custody, care and treatment. In the course
of his opinion, Justice Martin aptly pointed to the wide ac-
ceptance of statutes providing for indeterminate sentences
under the broad supervision of administrative agencies and
noted that such statutes have been upheld despite the objec-
tion that they entail the granting to executive officers of
powers which should remain exclusively in the judiciary. See
Note, "Indeterminate Sentence Laws," 50 *Harv. L. Rev.* 677,
678 (1937); Note, "New York's New Indeterminate Sen-
tence Law for Sex Offenders," 60 *Yale L. J.* 346 (1951).
*Cf. State v. Dugan,* 84 *N. J. L.* 603 (*Sup. Ct.* 1913), affirmed
85 *N. J. L.* 730 (*E. & A.* 1914).

In the case before us the defendant has confined his
attack on the Sex Offender Act to the single contention that,
as interpreted in *State v. Newton, supra,* it denies to him
the equal protection of the laws. In support of his contention
he stresses that other prisoners in State Prison who were
convicted of the same sex crimes (but were not committed

under *L.* 1950, *c.* 207) are entitled to commutation time for good behavior and work credits. See *R. S.* 30:4–92; *R. S.* 30:4–140; *N. J. S.* 2A:164–10. However, this ignores the fact that the Legislature has, with sufficient cause, classified certain repetitive, compulsive sex offenders as falling within a separate group urgently requiring, for the protection of society as well as the offenders themselves, special confinement and treatment until they are capable of making acceptable social adjustments, but in no event beyond the maximum term fixed by law. The constitutional power of the Legislature to make reasonable classifications of criminals for purposes of sentence and release is beyond question. See *Mahoney v. Parole Bd. of New Jersey,* 10 *N. J.* 269 (1952). In *Minnesota ex rel. Pearson v. Probate Court,* 309 *U. S.* 270, 60 *S. Ct.* 523, 84 *L. Ed.* 744 (1940), the court had occasion to deal with the constitutional validity of Minnesota's sexual psychopath statute which permitted the indeterminate confinement of sex offenders who had shown an utter lack of power to control their sexual impulses. In rejecting the contention that the statute denied to the defendant the equal protection of the laws the court said:

"Equally unavailing is the contention that the statute denies appellant the equal protection of the laws. The argument proceeds on the view that the statute has selected a group which is a part of a larger class. The question, however, is whether the legislature could constitutionally make a class of the group it did select. That is, whether there is any rational basis for such a selection. We see no reason for doubt upon this point. Whether the legislature could have gone farther is not the question. The class it did select is identified by the state court in terms which clearly show that the persons within that class constitute a dangerous element in the community which the legislature in its discretion could put under appropriate control. As we have often said, the legislature is free to recognize degrees of harm, and it may confine its restrictions to those classes of cases where the need is deemed to be clearest. If the law 'presumably hits the evil where it is most felt, it is not to be overthrown because there are other instances to which it might have been applied.' *Lindsley v. Natural Carbonic Gas Co.,* 220 *U. S.* 61, 78, 79, 31 *S. Ct.* 337, 55 *L. Ed.* 369, 377, *Ann. Cas.* 1912C 160; *Miller v. Wilson,* 236 *U. S.* 373, 384, 35 *S. Ct.* 342, 59 *L. Ed.* 628, 632, *L. R. A.* 1915F 829; *Semler v. Oregon State*

*Dental Examiners*, 294 *U. S.* 608, 610, 611, 55 *S. Ct.* 570, 79 *L. Ed.* 1086, 1088, 1089; *West Coast Hotel Co. v. Parrish*, 300 *U. S.* 379, 400, 57 *S. Ct.* 578, 81 *L. Ed.* 703, 713, 108 *A. L. R.* 1330." 309 *U. S.*, at *page* 274–275, 60 *S. Ct.* at *page* 526, 84 *L. Ed.*, at *page* 750.

The principles expressed in the *Pearson* case have been echoed in many decisions rejecting the contention that state statutes regulating sex offenders violated the equal protection clause of the Federal Constitution. See *Ex parte Keddy, supra; People v. Chapman, supra; People v. Sims, supra; In re Moulton, supra;* Note, "Indiana Sexual Psychopath Statute," 25 *Ind. L. J.* 186, 188 (1950) ; Note, "Special Statutory Treatment for Sexual Psychopaths," 3 *Buffalo L. Rev.* 304, 306 (1954). *Cf. Eggleston v. State,* 209 *Md.* 504, 121 *A. 2d* 698 (1956). *L.* 1950, *c.* 207, grouped designated sex offenders whose conduct was found to have been characterized by a pattern of repetitive, compulsive behavior and either violence or age disparity. *N. J. S.* 2A:164–5. The statutory standard is legally adequate and the classification has a rational basis. Those within the class are not subjected to any improper discriminations. They are given special beneficial treatment designed to advance their interests as well as those of society. It is true that despite all available medical and psychiatric facilities and conscientious semi-annual statutory reviews (*N. J. S.* 2A:164–8), some of the offenders may be confined for maximum terms because they remain incapable of making an acceptable adjustment in the community. But that fact does not impair the constitutionality of the general legislation and, fortunately (as the experiences to date indicate) most of the offenders will actually benefit and be returned to society as law-abiding and useful citizens long before they approach the maximum terms prescribed by law.

We have no hesitancy in rejecting the claim of unconstitutionality asserted in the first point of the defendant's brief and come now to his second point where he urges that he was entitled to a hearing to determine whether his transfer to the State Prison "involved an abuse of discretion." Sec-

tion 3 of *L*. 1950, *c*. 207, imposed a duty upon the court to submit the convicted defendant to a program of specialized treatment for his mental and physical aberrations, if the report from the Diagnostic Center disclosed that his conduct was characterized by a pattern of repetitive, compulsive behavior and either (1) violence or (2) an age disparity. Although section 3 was amended in 1956, we are not here concerned with the amendment. *L*. 1956, *c*. 37. We have carefully examined the report from the Diagnostic Center (upon which Judge Knight relied in sentencing the defendant to Marlboro) and cannot say, with any present measure of assurance, that it brought the defendant within the statutory standard. We assume that the matters referred to in the report were sufficient to indicate that the defendant's conduct was characterized by a pattern of repetitive, compulsive behavior although nowhere in the report was there any direct finding to that effect. But we do not find enough to indicate that the defendant's conduct had been characterized by violence. Indeed, counsel for the State did not argue before us that the report satisfied the statutory requirement of violence; instead, he. relied entirely on the alternative statutory requirement of age disparity.

When the defendant committed the offenses for which he was convicted he was 19 years of age and the victims were under 15 years of age. The statute expressly provides that the age disparity provision shall be applicable when it appears that the victim was under the age of 15 years and the offender was "an adult aggressor." *N. J. S.* 2*A*:164–5. The quoted phrase, in its ordinary and widely accepted meaning, refers to a person who was at least 21 years of age. See *Lucas v. U. S. Fidelity & Guaranty Co.,* 113 *N. J. L.* 491, 493 (*E. & A.* 1934); *State v. Henderson,* 34 *Ariz.* 430, 272 *P.* 97 (1928). In the *Lucas* case, Chief Justice Brogan noted that at common law an adult was a person who had reached the age of 21, that our statutes refer to persons under 21 as minors, and that conversely persons of 21 years or more are adults. In the *Henderson* case, Justice Lockwood pointed out that under the laws of his state, juveniles under 18 came

under special statutory protection, and minors between 18 and 21 were triable for their criminal acts in the same manner as adults. Nevertheless, he held that a statute which dealt with assaults committed by "adults" referred only to persons who had "attained the full age of 21 years."

The State, while acknowledging that there is nothing in our Sex Offender Act which suggests that the Legislature was not using the word "adult" in its ordinary sense, places reliance on the New Jersey statutes which provide that children under 16 years of age shall not be tried for crime and that children who are 16 and 17 years of age may be tried for crime only where they demand jury trial or the juvenile court refers them to the county prosecutor. See *N. J. S.* 2A:85–4; *N. J. S.* 2A:4–15. We fail to see how these provisions may properly be invoked to alter the statutory language in the Sex Offender Act which is complete in itself and has no relation to our juvenile delinquency enactments. And we also fail to find any support for the suggestion that the Legislature actually intended to bring within *L.* 1950, *c.* 207, sex offenders between the ages of 16 and 21 whose prior conduct was not characterized by violence. The use of the terms "age disparity" and "adult aggressor," and the comments in the Commission's report which preceded the adoption of the act (*p.* 31), clearly indicate otherwise. In any event, *L.* 1956, *c.* 37, has already made significant changes in section 3, and if the Legislature considers it wise to alter its reference to adult aggressors, it may do so without delay.

 When the trial court received the Diagnostic Center's report, it sentenced the defendant to Marlboro without having submitted the report to the defendant or his counsel and without hearing. It is true that our court rules pertaining to presentence reports generally do not now embody any provisions for their submission to defendants or for hearing. Compare Knowlton, "Should Presentence Reports be Shown to Defendants?," 79 *N. J. L. J.* 409 (1956), with Gaulkin, "Should Presentence Reports be Shown to Defendants?," 79 *N. J. L. J.* 421 (1956). See Wyzanski, "A Trial Judge's Freedom and Responsibility," 65 *Harv. L. Rev.* 1281, 1291

(1952); Davis, "The Requirement of a Trial-Type Hearing," 70 *Harv. L. Rev.* 193, 256 (1956); Note, "Due Process and Legislative Standards in Sentencing," 101 *U. Pa. L. Rev.* 257, 262 (1952). But, unlike the Diagnostic Center's reports under *L.* 1950, *c.* 207, presentence reports are not prepared or submitted pursuant to any statute embodying legislative standards which are binding upon the courts and the parties and must be complied with faithfully. Indeed, even presentence reports may not be used in a manner which is so unfair as to infringe on fundamental concepts of justice and due process. See *Townsend v. Burke,* 334 *U. S.* 736, 68 *S. Ct.* 1252, 92 *L. Ed.* 1690 (1948). *Cf. Williams v. People of State of New York,* 337 *U. S.* 241, 69 *S. Ct.* 1079, 93 *L. Ed.* 1337, rehearing denied 337 *U. S.* 961, 69 *S. Ct.* 1529, 93 *L. Ed.* 1760 (1949). *State ex rel. Volden v. Haas, supra,* does hold that a convicted sex offender who has been committed for treatment under a sex psychopath statute has not been deprived of any constitutional rights because he has not received a copy of the required psychiatric report and has not had an opportunity to be heard thereon. But nothing in that case suggests that the summary course of procedure followed there is to be taken as generally necessary or desirable. See *Fleenor v. Hammond,* 116 *F.* 2d 982, 132 *A. L. R.* 1241 (6 *Cir.* 1941). *Cf. Petition of O'Leary,* 325 *Mass.* 179, 89 *N. E.* 2d 769 (1950). In *Ex parte Boyd,* 73 *Okl. Crim.* 441, 122 *P.* 2d 162, 170 (1942), the court, while holding that a statute relating to revocation of parole did not require a hearing procedure, aptly suggested that "to avoid arbitrary action such a procedure should be followed." Our Sex Offender Act does not expressly call for a hearing prior to sentencing, and we shall assume, for present purposes, that it is not compelled by the due process clause. Nevertheless we are convinced that the interests of justice will be advanced if, in every case which arises hereafter, the trial court, before imposing sentence under the Sex Offender Act, submits the Diagnostic Center's report to the defendant and affords opportunity to be heard thereon. An appropriate administrative directive will be issued forthwith by this court.

■ In the instant matter the defendant was not an adult aggressor and could not legally be brought within *L.* 1950, *c.* 207, unless his conduct was characterized by violence. The record of the trial which resulted in the defendant's convictions on March 17, 1952 has not been brought to our attention and the briefs and appendices submitted by the parties do not enlighten us on the matter. Accordingly, we find it necessary to remand the cause for further hearing and determination in the Monmouth County Court. If the County Court finds that the statutory requirements embodied in *L.* 1950, *c.* 207, § 3, were substantially fulfilled, then the defendant should be remanded to the Department of Institutions and Agencies for continued detention and treatment under the Sex Offender Act. If, however, the court finds that the statutory requirements were not met, then the defendant should be resentenced on his criminal conviction in accordance with law. *N. J. S.* 2A:164–9. See *N. J. S.* 2A:138–1; *N. J. S.* 2A:115–1; *N. J. S.* 2A:96–3; *N. J. S.* 2A:85–5; *N. J. S.* 2A:85–7. *Cf. State v. Flood,* 32 *N. J. Super.* 161 (*App. Div.* 1954). During the hearing in the County Court the record of the criminal trial as well as the report from the Diagnostic Center may formally be received, along with any other materials which may bear on the issues before the Court. See *In re Mundy,* 97 *N. H.* 239, 85 *A. 2d* 371 (1952); *cf. Barber v. Hochstrasser,* 136 *N. J. L.* 76, 81 (*Sup. Ct.* 1947); *N. J. S.* 2A:82–34 *et seq.*

■ Since there is to be a further hearing in the County Court we see no just reason why it should not encompass the defendant's contention that his transfer to State Prison "involved an abuse of discretion." We recognize that the statutory transfer power vested in the Commissioner is highly discretionary and that courts will not ordinarily interfere with its exercise. But it is not unlimited and if a defendant who has been committed to a hospital for treatment under the terms of the Sex Offender Act makes an affirmative showing that his transfer to State Prison was arbitrary and in conflict with the purposes underlying his sentence, he

may obtain judicial relief by *habeas corpus* or otherwise. See *Miller v. Overholser,* 92 *U. S. App. D. C.* 110, 206 *F. 2d* 415 (*D. C. Cir.* 1953). *Cf. R. R.* 4:88–8. The Appendix submitted in this court by the State embodies a comprehensive *ex parte* record of the proceedings in the Department of Institutions and Agencies. See *Bailey v. Council of the Div. of Planning, etc., State of New Jersey,* 22 *N. J.* 366, 375 (1956). It strongly indicates that it has been the defendant's recalcitrant conduct which has thus far frustrated the State's efforts at treatment designed to enable his early release as a person capable of making an acceptable social adjustment in the community. *N. J. S.* 2A:164–8. It may properly be received during the hearing in the County Court, with fair opportunity to the defendant to meet its contents.

Our modern sex offender legislation was preceded by a thorough-going study and was thoughtfully designed to protect the public without impairing individual rights. Still, it has tremendous sweep and presents real danger of abuse. Judicial determinations that the statutory standards have been met have far-reaching consequences and may result in confinement for very long periods of time. Decent regard for the social and individual interests concerned requires that such determinations be made only upon careful judicial deliberation and after fair opportunity for hearing has been afforded. When defendants are lawfully committed under the statute, the Department must thereafter conscientiously seek to attain fulfillment of the legislative program. The administrative determinations as to custody and treatment must, of course, rest initially with the departmental officials and courts will generally not disturb their decisions. Nevertheless, here as elsewhere throughout our governmental administration, arbitrary or capricious action is impermissible and upon a sufficient showing of such conduct judicial relief will justly be afforded.

Reversed and remanded for further proceedings in the Monmouth County Court.

HEHER, J. (dissenting). Defendant's status before the law involves an assessment of the sense and meaning of *N. J. S. 2A*:164–3 *et seq.*

*N. J. S.* 2A:164–5 ordains that if the report of the Diagnostic Center reveals a determination "through clinical findings" that the convicted sex offender's "conduct was characterized by (a) A pattern of repetitive, compulsive behavior; and (b) Either violence; or (c) An age disparity from which it shall appear that the victim was under the age of 15 years and the offender is an adult aggressor; it shall be the duty of the court, upon recommendation of the Diagnostic Center, to submit the offender to a *program of specialized treatment* for his *mental and physical aberrations.*" (Emphasis supplied.)

This is the section as it was at the time of the defendant's conviction, March 17, 1952, on an indictment charging carnal abuse, *N. J. S.* 2A:138–1, open lewdness, *N. J. S.* 2A:115–1, and an attempt to impair the morals of a child under age 16, *N. J. S.* 2A:85–5; 2A:96–3. By *L.* 1956, *c.* 37, subdivision (a) was amended to include this exception: "and, except in convictions for open lewdness or indecent exposure," thus qualifying the alternative subdivisions (b) and (c).

The "disposition" to be made by the court of such person, section 2A:164–6, "upon written report and recommendation of the Diagnostic Center, shall include 1 or more" of these measures: (a) Probation with "out-patient psychiatric treatment in the manner to be prescribed in each individual case"; (b) Such person "may be committed to an institution to be designated by the commissioner of institutions and agencies for *treatment,* and upon release shall be subject to parole supervision"; and in the latter event, the order of commitment "shall not specify a minimum period of *detention,*" but in no event shall the person *"be confined or subject to parole supervision* for a period of time greater than that provided by law for the crime of which such person was convicted." (Emphasis added.)

The Commissioner is directed, upon the commitment of "such person," *section 2A:164–7*, to "arrange for his *treatment*" in "one of the institutions" under the jurisdiction of the Department which, in his judgment, "is *best suited* to care for the *needs* of such person"; and he is empowered to transfer "such person" from one "institution" to another in the Department's jurisdiction, "for the purpose of providing for the *needs and requirements* of such person according to the individual circumstances of the case." (Emphasis added.)

And "Any person committed to confinement," as provided by *section 6*, may be released under parole supervision, *N. J. S. 2A:164–8*, when it shall appear to the satisfaction of the State Parole Board, "after recommendation by a special classification review board" appointed by the State Board of Control of Institutions and Agencies, that "such person is capable of making an acceptable social adjustment in the community"; and it is made the duty of the "chief executive officer of any institution wherein such a person is confined" to "report in writing at least semi-annually" to the Commissioner concerning the "physical and mental condition of such person" with a recommendation "as to his continued confinement or consideration for release on parole."

Where the report of the Diagnostic Center, *section 2A:164–9*, affirms that the "offender's conduct was not characterized by a pattern of repetitive, compulsive behavior and neither violence nor age disparity was indicated, as provided for in *section 2A:164–5*," the court is directed to "impose sentence on such person in the manner provided by law."

No statute, *N. J. S. 2A:164–10*, relating to "remission of sentence" by way of commutation time for good behavior and work performance shall apply to any person "committed" under *section 6*, but provision may be made for "monetary compensation" by the Department "in lieu of remission of sentence for work performed."

And there is provision, *section 2A:164–13*, for the voluntary admission to the Diagnostic Center of any person

believing himself to be suffering from a "physical or mental condition which may result in sexual trends dangerous to the welfare of the public"; and for later "voluntary admission," if such condition is found to exist and the person so afflicted indicates a desire for treatment, to "an institution to be designated by the commissioner," where he shall receive the "treatment indicated by the circumstances in the individual case," which such person may discontinue on five days' notice, in writing, to the chief executive officer of the institution "of his intention to leave."

We have no occasion now to consider whether there is a scientific and factual basis for the "clinical finding" that this "offender's conduct" was "characterized" by a "pattern of repetitive, compulsive behavior"; it suffices here to say that when the Diagnostic Center makes the statutory findings, it becomes the peremptory "duty" of the court to "submit the offender" to a "program of specialized treatment for his mental and physical aberrations," a course of action in no sense penal but rather regenerative for his eventual social adjustment and integration, and meanwhile protective of society itself against such "repetitive, compulsive behavior," due to "mental and physical aberrations." It is a socio-legal measure wholly devoid of the punitive, in essence preventive and reformative, in keeping with the teachings of sociological and psychological experience; and it cannot be converted into a confinement that savors of the penal in disregard of the essential policy to be served. The reason and spirit of the statutory rehabilitative process cannot be subverted for administrative convenience.

We need not now ponder the implications of the legislative terms, "repetitive, compulsive behavior" and "mental and physical aberrations." In *psychopathology*, "compulsion" means "an irresistible impulse to perform some irrational act." *Webster's New World Dictionary*, 1953. Such an inquiry could conceivably involve the freedom of will and the power of choice, the *mens rea*, essential to moral or criminal responsibility. See *State v. Monahan*, 15 *N. J.* 34, 49 (1954); *State v. Lynch*, 130 *N. J. L.* 253 (*E. & A.*

1943). In Michigan, for example, as Justice Jacobs points out, a criminal conviction is not a precondition. There is provision for a hearing to determine whether the defendant is a "criminal sexual psychopathic person"; and he may be "confined," if so adjudged, until "fully and permanently recovered from such psychopathy"; and there is no fixed maximum term of confinement. *People v. Chapman,* 301 *Mich.* 584, 4 *N. W. 2d* 18 (*Sup. Ct.* 1942). But we have here provision for a post-conviction psychotherapy technique; and the procedure is to be assayed accordingly.

The contention is that the cited statute, as interpreted in *State v. Newton,* 17 *N. J.* 271 (1955), "denies to this defendant the equal protection of the law"; and, at all events, defendant is entitled to a hearing to determine whether his transfer to the State Prison "involved an abuse of discretion."

Judge Knight "sentenced" defendant, May 7, 1952, "to the New Jersey State Hospital at Marlboro for an indeterminate period"; July 16, 1952, he was transferred to the Trenton State Hospital, and eight months later, March 31, 1953, he was taken to the State Prison as a "non-psychotic sex offender," "reported" by the hospital's Medical Superintendent as one of the "ring-leaders" in a "well-organized plan to stage a demonstration" in the hospital's dining room; he was at age 19 placed in the State Prison for "safekeeping," and there he has remained for more than four and a half years. Thus it is that, as in *Newton,* the "offender" here is confined in the State's maximum-security prison, not under sentence for a maximum-minimum term sanctioned by the State's limited indeterminate sentence law, with commutation credits for good behavior and work performance, parole eligibility, and other ameliorating benefits designed to inculcate the resolve for rehabilitation as a primary adjunct of the punitive process, but by the decree of the Commissioner to serve, it is now held, the maximum of the term of 30 years fixed by law for the crimes of which he was convicted, not entitled to remission of sentence by way of commutation time but only to monetary compensation

for work performance and to release "under parole supervision," *N. J. S.* 2*A* :164–8, if and when "a special classification review board" appointed by the State Board of Control shall recommend to the State Parole Board, and that Board shall then be satisfied, that he "is capable of making an acceptable social adjustment in the community."

Defendant is a prisoner in the State Prison, not under the sentence of a judge of the court in which the conviction was had, but by the action of a state administrative officer on the report of the hospital medical superintendent that he was in a rebellious mood; and this, in disregard of the essential principle and policy of the statute and the peremptory requirements of due process and the equal protection of the laws.

And, as in *Newton,* there is no showing here that the State Prison is equipped with the "special treatment" facilities needed to fulfill the legislative policy of medical and psychotherapy in a field where the rate of recidivism is low; at all events, the law-giver plainly had in view for persons of the given class a radically different social policy and rule of action, one of specialized rehabilitative treatment, physical and psychological, for which the punitive climate and associations are ill-adapted and deterrent, not to mention the circumstances of maladjusted mind and body as mitigating moral guilt; for the others, there is to be, *section* 2*A* :164–9, "sentence * * * in the manner provided by law." This sociological measure for mental, moral and physical health is not to be administered in the penal system. Indeed, the prime motivation for defendant's transfer to the prison was "safekeeping," presumably on the hypothesis that the function of the State Hospital was the care and treatment of "psychotics" alone. Note the difference in the legislative terms: *section* 6 speaks of the "disposition" to be made when the prerequisite clinical findings are made by the Diagnostic Center; *section* 9, of "sentence" in the manner provided by law where such findings are not made.

The history given in the opinion of my colleagues makes manifest the unsuitability of the prison as a corrective mechanism. The Diagnostic Center reported, April 15, 1952, that defendant had a severe psychiatric disturbance and recommended that he be committed to a State Hospital for further observation. At Marlboro, he was resistant to "shock treatments," "uncooperative," "antagonistic, aggressive, hostile and defensive," and found to be "without psychosis, psychopathic personality with pathological sexuality," and the medical director of the hospital recommended, July 7, 1952, that he be transferred to a "penal" institution; the recommendation was rejected by the Commissioner, but later, on July 16, 1952, he was taken to the State Hospital at Trenton. At the State Prison, he was classified as "an extremely primitive and inadequate personality, perhaps a simple schizophrenic"; and later on, May 11, 1953, the Director of Education and Counseling concluded that defendant's sexual drive was "compulsive in character," and he was "confused and threatened by sexual impulses he can neither acknowledge nor control," and "is not to be considered in the category of the wilfully deliberate and self-controlled sex offender"; he is "still highly neurotic and compulsive and is unable to cope with his own impulses"; he, himself, had said "he wanted neither a parole nor a transfer to Bordentown [the State Reformatory] but that he did want to go to the State Hospital at Marlboro"; and on November 9, 1956 a counselor at the prison, Mr. Olive, addressed a memorandum to Dr. Revitch, a psychiatrist at the Diagnostic Center, suggesting that defendant might "respond more appropriately to the therapeutic environment of a hospital," and that he be considered "for possible transfer to the State Hospital." Yet he remains in the prison.

Here we have utter frustration of the legislative design. Commitment to prison cannot be excused by the difficulties attending the fulfillment of the statutory redemptive process. He was not "sentenced" as a criminal, to expiate his crime in a penal institution, but rather was "submitted," as a

sexual psychopath, to a program of "specialized treatment" for his "mental and physical aberrations."

There is serious question as to whether at this late day, some five and a half years after his conviction, the County Court would have jurisdiction to sentence defendant under *N. J. S.* 2A :164–9, assuming the want of the clinical findings requisite to action under *N. J. S.* 2A :164–5. But there is no occasion now to consider the point.

I would reverse the judgment and remand the cause for the discharge of the defendant from confinement in the State Prison and the taking of further proceedings in conformity with the statutory policy and purpose.

*For reversal and remandment*—Chief Justice WEINTRAUB, and Justices WACHENFELD, BURLING and JACOBS—4.

*For reversal and remandment in accordance with dissenting opinion*—Justice HEHER—1.

*For affirmance*—Justice OLIPHANT—1.