288 F.3d 532
 Charles A. LEAMER, Jr., Appellant,
v.
William H. FAUVER; William F. Plantier; Scott Faunce; Deborah Faunce; Essie Williams; Michael Mancuso; William Blake; Charles Anderson; Brian Marsh; Waymon Benton; Linda Gorman; Pat Deming; Joseph Reiher; Wayne Sager; Donna Klipper; George Blaskewicz; Michelle M. Levi; Dorthy Ward; Lawrence Turek; Jeffrey Allen; Nancy Graffin, individually and in their official capacities; Grace Rogers.
 No. 98-6007.
 United States Court of Appeals, Third Circuit.
 Argued November 9, 2001.
 Filed April 19, 2002.
 
 COPYRIGHT MATERIAL OMITTED James A. Plaisted (Argued), Walder, Sondak & Brogan, Roseland, NJ, for Appellant.
 Lisa A. Puglisi (Argued), Office of Attorney General of New Jersey, Division of Law, Trenton, NJ, for Appellees.
 Before McKEE, RENDELL and STAPLETON, Circuit Judges.
 OPINION OF THE COURT
 RENDELL, Circuit Judge.
 
 
 1
 In 1978 Charles Leamer was sentenced under a since-repealed provision of the New Jersey statutes to an indeterminate term of up to 42 years at an Adult Diagnostic and Treatment Center in Avenel, New Jersey. He had pled guilty to a charge of rape and a separate charge of assault with intent to rape. Under the terms of his sentence, he was to receive "specialized treatment for his mental and physical aberrations" and be released only when he "is capable of making an acceptable social adjustment in the community." On February 18, 1993, Leamer was shifted to a Restricted Activities Program ("RAP"). His claims arise from his placement and maintenance on RAP status, and from the consequences that attended that placement. Leamer filed a complaint alleging violations of 42 U.S.C. § 1983 in October 1995. At that time, he was still on RAP status. He was removed from RAP status on August 14, 1996. The District Court dismissed his complaint pursuant to Federal Rules of Civil Procedure 12(c) on January 30, 1998.
 
 I. Jurisdiction and Standard of Review
 
 2
 The District Court had jurisdiction of Leamer's 42 U.S.C. § 1983 claim based on 28 U.S.C. § 1343. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291, because the District Court granted the Motion to Dismiss pursuant to Rule 12(c). Our review of a grant of a Motion to Dismiss under Rule 12(c) is plenary, and, as with reviewing the grant of a Motion to Dismiss under 12(b)(6), we view the facts alleged in the pleadings and the inferences to be drawn from those facts in the light most favorable to the plaintiff, and judgment should not have been granted unless the moving party has established that there is no material issue of fact to resolve, and that it is entitled to judgment in its favor as a matter of law. Jablonski v. Pan American World Airways, Inc., 863 F.2d 289, 290-91 (3d Cir.1988).
 
 
 II. Statement of Facts
 
 
 3
 Leamer was incarcerated at Avenel on May 8, 1978. Pursuant to the provisions of 2A: 164-3, et seq., he received regular and intensive therapy, including both group and individual therapy. He served as a therapy clerk, earning $2.75 per day. On February 18, 1993, Leamer was placed in the Close Custody Unit, on RAP status. The following day, he was provided with a form stating that he had been assigned to the Close Custody Unit because of his "exhibition or indication of unstable mental or physical behavior which suggests probable harm to inmate, to others, or to property."[1] He was brought before the Institutional Classification Committee ("ICC") and informed that he had been placed on cell RAP for "attempting to hire a hitman." He was also informed that after he was placed on RAP status, personnel searching his cell had found a letter that had been addressed (but never sent) to Dr. Catherine Blandford, one of Leamer's therapists. Despite Leamer's attempts to deny any wrongdoing, he was told he would be maintained on RAP status "pending further investigation." As a result of his placement on RAP, his job assignment was changed, his earnings dropped to $1.30 per day, and he was denied outside recreation and other freedoms within the institution. During the next 3 years, Leamer was maintained on RAP status, though sometimes confined to his cell and sometimes to his wing. According to his complaint, Leamer's status was reviewed regularly, but he was not present at the reviews except on a few occasions.[2] Fur Leamer alleges that the written statements of the reviews that were provided to him did not specify the basis for the decisions, did not include any of the reports upon which at least some of the decisions were purportedly based, and did not provide him an opportunity to respond. In February 1994, Leamer was shifted to Phase I, a status usually reserved for new inmates, because of "poor institutional adjustment." Phase I status allegedly precludes the obtaining of higher-paying institutional jobs, participating in the parole release process, participating in certain educational and recreational programs, and achieving "gang or full minimum custody status."
 
 
 4
 Although the March 1993 review stated that Leamer would be permitted to attend group therapy "as arranged by his therapist," Leamer alleges that he was not able to attend group therapy. In May 1993, he was assigned to self-directed "writing therapy" which precluded any group or individual therapeutic contact. After protests, he was told that he could attend group therapy "as arranged by a therapist," but only with a two-officer escort. In his Complaint, Leamer cites eleven separate appeals and protests that he directed to the Superintendent and/or the Director of Psychology, asking that his therapy be reinstated or that arrangements be made to allow him to attend group therapy. He identifies only two occasions on which escorts enabled him to attend a required therapeutic group that had sixteen scheduled sessions, and identifies another group to which he was assigned but never escorted.
 
 
 5
 Pervading Leamer's thirty-six page pro se Complaint is a profound sense of frustration at being assigned to and maintained on RAP status and eventually on Phase I status for failing to progress in therapy — yet being unable to attend therapy as a consequence of that status. He also expresses frustration with the deprivations attendant upon and the perfunctory "reviews" of his status. For example, Leamer describes a hunger strike that he began on November 24, 1993. When Wayne Sager, a therapist who was Director of Psychology for some of the period at issue, inquired as to why he had undertaken the hunger strike, Leamer replied that it was "due to the consistent negative responses from staff members to Plaintiff's many requests of Defendant Turek [also a therapist] to have Plaintiff called to group, to have access to Defendant Turek, and to thereby communicate with Turek. Plaintiff informed Sager that he would continue a hunger strike until he (Plaintiff) was provided with regular access to a therapist." Sager's response allegedly was to advise Leamer to bring the issue up in the group sessions that he was complaining about being unable to attend and resolve it "through the normal therapeutic process." As Leamer stated, "Plaintiff was at a loss as to how to handle the matter through the regular therapeutic process when Defendant Turek would neither make arrangements to have Plaintiff escorted to group nor would meet or converse with Plaintiff." In February 1994, at a review Leamer was not allowed to attend, he was demoted "to Phase I status due to poor institutional adjustment." In March 1994, noting another review at which he was not present that merely confirmed his continued status, Leamer comments: "The ICC makes reference to a therapist's report. First, the Plaintiff neither saw nor communicated with his therapist, or any other therapist, prior to the submission of such report and, second, Plaintiff was not given the content of the report, not even summarily, thereby precluding Plaintiff from rebutting, refuting, or even utilizing such reported information to enable him to gain release from RAP." Again in August 1994, without Leamer's being present, a semi-annual review concluded that Leamer needed to remain in Phase I due to "insufficient progress in therapy." Leamer complains: "By Plaintiff not being provided with the escort to bring Plaintiff to his therapy sessions and Defendant Turek neither seeing nor communicating with Plaintiff, Plaintiff is thereby prevented from progressing in therapy, prevented from obtaining a higher phase, prevented from obtaining release from RAP, and prevented, thereby, from ever reaching the point of eligibility for parole."
 
 
 6
 There are several points in the complaint where Leamer addresses therapy alone, or in conjunction solely with the removal from RAP status, but there are also several places in the complaint when Leamer speaks of parole, though always as a possibility foreclosed by his continued lack of therapy. For instance, he avers: "The only possible way for a 2A inmate, such as Plaintiff, to obtain the possibility of parole is to be provided with treatment to which he is mandated by law to receive." And again, "Plaintiff, by being denied access to the group is further impeded from proceeding in the parole release process." "Plaintiff, by being denied access to the group to complete the course is further impeded from proceeding in the parole release process." This theme is repeated throughout his pleading. In his request for declaratory relief, Leamer asks that we declare the refusal to provide him with treatment contrary to the United States and New Jersey Constitutions and New Jersey state law, but says nothing whatsoever about parole or release from confinement. Again, in his request for injunctive relief, he asks that the defendants be ordered to "refrain from denying Plaintiff his mandated treatment and requisite parole eligibility therefrom."
 
 
 7
 Leamer has sued William H. Fauver, Commissioner of the New Jersey Department of Corrections, and twenty-one present and former employees of the Avenel Adult Diagnostic and Treatment Center in both their official and individual capacities. Most are alleged to have held positions on the Institutional Classification Committee that was responsible for reviewing Leamer's RAP status. Others are alleged to have participated in the Internal Affairs Units for the New Jersey Department of Corrections and for the Avenel Adult Diagnostic and Treatment Center. Still others were therapists to whom Leamer was assigned, or who supervised therapists to whom Leamer was assigned. In his complaint, he casts his claims in five causes of action: a Fourteenth Amendment due process violation, an Eighth Amendment violation of the proscription against cruel and unusual punishment, an ex post facto increase in his punishment, a Fourteenth Amendment equal protection violation, and a violation of the state statutory provisions guaranteeing him mental health treatment under a non-punitive scheme. He prays for declaratory and injunctive relief, as well as damages.
 
 
 III. District Court Opinion
 
 
 8
 The District Court granted the Defendants' Motion to Dismiss under Rule 12(c), resting its decision primarily upon its reading of Edwards v. Balisok, 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997). In Balisok, a Washington state inmate had filed a § 1983 claim challenging the procedures used in a disciplinary hearing that had resulted in a loss of good-time credits. The Supreme Court held that because the inmate's challenge necessarily implied that his sentence was invalid, because the good-time credits should not have been taken away, it could only be brought on a writ of habeas corpus. The District Court read Balisok as precluding civil rights actions based on due process claims regarding the "invalidity of the punishment imposed." Because Leamer is complaining of the lack of therapy and its impact on his RAP status, the District Court reasoned that he was implying that his sentence was possibly longer than it would have been, which implied the "invalidity of his restrictive status" and "ultimately impacts the length of Plaintiff's sentence." Further, because the District Court viewed Balisok as preclusive, it discounted Leamer's analogy to Gerald v. Commissioner, New Jersey Department of Corrections, 102 N.J. 435, 508 A.2d 1113 (N.J.1986). As is discussed in more detail below, we feel that the District Court did not view the holding of Balisok correctly, and that Gerald does help to elucidate the position of New Jersey in this case.
 
 
 9
 Although recognizing that Leamer was seeking injunctive relief in addition to damages, and noting that injunctive relief would not have been foreclosed under Balisok, the District Court believed that Leamer was seeking only to reverse his RAP status and reinstitute therapy, neither of which were prospective, and, consequently, relief could not be granted. Despite the District Court's conclusion that Balisok disposed of the case, it did characterize the individually alleged constitutional violations as "without merit." The District Court perceived Leamer's due process challenge as procedural and baseless, since Leamer's complaint detailed regular reviews and described procedures that were adhered to, or substantially adhered to, by the defendants.
 
 
 10
 The District Court likewise disposed of the equal protection, ex post facto and state law claims, as well as the claims directed against Fauver individually.[3] Leamer has not raised the dismissal of these claims on appeal, and consequently, they are not before us.
 
 
 11
 We find the District Court's interpretation of Balisok to be in error. Further, we believe that the unique statutory scheme set up by New Jersey compels a re-examination of the merits of Leamer's claims. On appeal, Leamer has requested that we recognize that he has a liberty interest in treatment, and that the constitutional violations he alleged are cognizable as § 1983 claims. We agree that we should do so. Because our understanding of the requirements of the New Jersey statute is integral to our conclusions, we will analyze its provisions first.
 
 
 IV. Statutory History
 
 
 12
 The structure of the statutory scheme established by New Jersey to ensure treatment for sex offenders is somewhat unique.[4] The 2A provisions at issue here were originally enacted in 1949, and in 1950 they were revised to reflect the findings of a commission especially appointed to study the treatment of sex offenders. State v. Wingler, 25 N.J. 161, 135 A.2d 468, 472-73 (N.J.1957). The resulting provisions embodied the legislative determination that sex offenders should be committed to either a mental or correctional institution for treatment and released when "capable of making an `acceptable social adjustment,' but in no event beyond the maximum term prescribed by law for the crime of which he was convicted." Id. at 473. In upholding the constitutionality of the 2A provisions against a challenge that it unfairly denied persons convicted and committed under those provisions to the commutation for good behavior and work accorded to persons convicted of the same crimes but not committed, the New Jersey Supreme Court said,
 
 
 13
 [T]he Legislature has, with sufficient cause, classified certain repetitive, compulsive sex offenders as falling within a separate group urgently requiring, for the protection of society as well as the offenders themselves, special confinement and treatment until they are capable of making acceptable social adjustments, but in no event beyond the maximum term fixed by law. The constitutional power of the Legislature to make reasonable classifications of criminals for purposes of sentence and release is beyond question.
 
 
 14
 . . .
 
 
 15
 Those within the class are not subjected to any improper discriminations. They are given special beneficial treatment designed to advance their interests as well as those of society. It is true that despite all available medical and psychiatric facilities and conscientious semi-annual statutory reviews, some of the offenders may be confined for maximum terms because they remain incapable of making an acceptable adjustment in the community. But that fact does not impair the constitutionality of the general legislation, and, fortunately (as the experiences to date indicate) most of the offenders will actually benefit and be returned to society as law-abiding and useful citizens long before they approach the maximum terms prescribed by law.
 
 
 16
 Id. at 475-76. "[T]he findings of the statutory facts for special commitment under the act do not entail a heavier penalty on the offender, but only a different, specially adapted method of dealing with the offender, for both his benefit and that of society...." State v. Blanford, 105 N.J.Super. 56, 251 A.2d 138, 140 (N.J.Super. Ct.App.Div.1969), remanded on other grounds by State v. Horne, 56 N.J. 372, 267 A.2d 1 (N.J.1970). New Jersey courts have interpreted 2A as requiring the provision of treatment. See, e.g., State v. Harvey,162 N.J.Super. 386, 392 A.2d 1248, 1251 (N.J.Super. Ct. Law Div.1978), aff'd. 170 N.J.Super. 391, 406 A.2d 724 (N.J.Super.Ct.App.Div.1979) ("The Commissioner has an affirmative duty to treat defendant. It is not conditioned on defendant's ability to fit into a particular modality. If the present operation at A.D.T.C. is unable to meet his needs, the Commissioner has a responsibility to formulate and implement a policy which will.")[5]; see also Lair v. Fauver, 595 F.2d 911, 913-914 (3d Cir.1979).
 
 
 17
 Since the replacement of 2A by 2C — which is a hybrid between a therapeutic and purely penal statute and provides for credits and standard parole provisions — the New Jersey courts have compelled the Department of Corrections to resentence 2A offenders under 2C if the Department of Corrections has physically transferred an inmate to a location that will not provide the treatment mandated under 2A. See Gerald v. Commissioner, N.J. Dept. of Corr., 102 N.J. 435, 508 A.2d 1113 (N.J. 1986); State v. Cruz, 125 N.J. 550, 593 A.2d 1169, 1171 (N.J.1991). Courts have considered it a matter of "statutory compulsion and fundamental fairness" that pre-Code offenders be resentenced with the same opportunities for parole as post-Code offenders unless treatment is provided. Id. at 1172-73 (construing Gerald).
 
 
 V. Habeas Corpus and Section 1983
 
 
 18
 Although both § 1983 and habeas corpus allow prisoners to challenge unconstitutional conduct by state officers, the two are not coextensive either in purpose or effect. Habeas relief is clearly quite limited: "The underlying purpose of proceedings under the `Great Writ' of habeas corpus has traditionally been to `inquire into the legality of the detention, and the only judicial relief authorized was the discharge of the prisoner or his admission to bail, and that only if his detention were found to be unlawful.'" Powers of Congress and the Court Regarding the Availability and Scope of Review, 114 Harv. L.Rev. 1551, 1553 (2001). Section 1983, in contrast, provides for liability on the part of any state actor who "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. It has been described as a "species of tort liability." Smith v. Holtz, 87 F.3d 108, 111 (3d Cir.1996)(discussing Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994)). There is only a narrow subset of actions that arguably might properly be brought as either, that is, where the deprivation of rights is such that it necessarily impacts the fact or length of detention. In a series of decisions, the Supreme Court has made it clear that for those cases, the narrower remedy, the habeas petition, is the only available avenue of relief. Balisok was one of these decisions.[6] In it, the Court clarified that a plaintiff cannot circumvent the overlap between habeas and § 1983 by raising an issue as an attack upon procedure rather than substance, when resolution of the issue in his favor would necessarily imply the invalidity of the sentence — the fact or duration of detention. The Court noted that proper judicial response to such procedural defects is to invalidate the flawed decision that impacted the sentence, by reinstating the removed "good time" credits — the same remedy that would attach if the substance were attacked. 520 U.S. at 646-47, 117 S.Ct. 1584. Because the remedy therefore is, in actuality, a habeas remedy, the plaintiff must proceed by way of a habeas petition.
 
 
 19
 As noted above, Balisok was not decided in a vacuum. In Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973) the Court had granted certiorari specifically to consider whether state prisoners may use § 1983 to challenge the constitutionality of acts that deprived them of good-time credits where the remedy would be restoration of their credits and a shortening of their sentence. 411 U.S. at 482, 93 S.Ct. 1827. In holding that the action was only appropriate under habeas, the Court looked to the purpose of the habeas statute — to secure release from illegal custody. Id. at 487-88, 93 S.Ct. 1827. It then determined that the exhaustion requirements of the more specific habeas statute should be satisfied when the remedy sought is a habeas remedy Id. at 492, 93 S.Ct. 1827. Preiser's holding was specifically limited to persons seeking equitable relief and not damages. Id. at 494, 93 S.Ct. 1827. In distinguishing the cases where the Court had upheld the use of § 1983 to challenge the conditions of their confinement, the Court noted:
 
 
 20
 But none of the state prisoners in those cases was challenging the fact or duration of his physical confinement itself, and none was seeking immediate release or a speedier release from that confinement-the heart of habeas corpus.
 
 
 21
 ...
 
 
 22
 It is clear, then, that in all those cases, the prisoners' claims related solely to the States' alleged unconstitutional treatment of them while in confinement. None sought, as did the respondents here, to challenge the very fact or duration of the confinement itself. Those cases, therefore, merely establish that a § 1983 action is a proper remedy for a state prisoner who is making a constitutional challenge to the conditions of his prison life, but not to the fact or length of his custody.
 
 
 23
 Id. at 498-99, 93 S.Ct. 1827. (Emphasis added). Heck v. Humphrey resolved one of the questions explicitly left unresolved in Preiser: where the challenge is to the legality of the prisoner's confinement, it is not sufficient for the prisoner to raise the claim solely as a damages action and thus avoid the exhaustion requirement of habeas. 512 U.S. at 481-82, 114 S.Ct. 2364. Instead, if a judgment in favor of the plaintiff would "necessarily imply the invalidity of his conviction or sentence" it is not appropriately brought under § 1983. Id. at 487, 114 S.Ct. 2364. Conversely, if the success of the plaintiff's § 1983 action "will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit." Id. (emphasis in original). Balisok then addressed another question left open in Preiser: may the plaintiff raise an issue as an attack only upon procedure rather than substance? Again, the Court found that a plaintiff could not mask a claim that really required habeas relief as a § 1983 claim. 520 U.S. at 646-47, 117 S.Ct. 1584. Most recently, in Spencer v. Kemna, the Court addressed a contention that a habeas action brought subsequent to the expiration of the prisoner's sentence should not be viewed as moot, because the plaintiff would have been foreclosed from bringing an action under § 1983 unless he could establish the invalidity of his parole revocation. The Court stressed that § 1983 damages need not "always and everywhere be available," and noted that recovery under § 1983 would not be foreclosed if his challenge were to procedures and not the result, as long as "the procedural defect did not `necessarily imply the invalidity of' the revocation." 523 U.S. at 17, 118 S.Ct. 978.
 
 
 24
 When read together, there is a logical and coherent progression of Supreme Court jurisprudence clarifying when § 1983 is unavailable: whenever the challenge ultimately attacks the `core of habeas' — the validity of the continued conviction or the fact or length of the sentence — a challenge, however denominated and regardless of the relief sought, must be brought by way of a habeas corpus petition. Conversely, when the challenge is to a condition of confinement such that a finding in plaintiff's favor would not alter his sentence or undo his conviction, an action under § 1983 is appropriate.
 
 
 25
 Here, the District Court's reasoning regarding Balisok was somewhat cryptic. On the one hand, the Court stated that Leamer had failed to allege a violation of the Due Process clause because "this claim would necessarily imply the invalidity of the discipline imposed." The Court found Balisok "factually similar" to the Plaintiff's claims, noting that Leamer "alleges that certain of the defendants conspired to wrongfully place and maintain Plaintiff on RAP status through prejudice, deceit and arbitrariness," and that "Plaintiff's allegations would imply the invalidity of his restrictive status. Therefore, as in Balisok, Plaintiff has not stated a valid claim under § 1983." On the other hand, the Court concluded that "the denial of therapy and the inability to gain release from RAP status prevented him from getting paroled, possibly resulting in a longer sentence for him."
 
 
 26
 The District Court appears to have gone astray in two ways: one in its reading of Balisok, and the other in its reading of Leamer's complaint. By implying that Balisok extends the rule of Preiser and its progeny to any disciplinary proceeding — regardless of whether the outcome necessarily impacts the duration of the sentence — the District Court unnecessarily invalidated claims that are not truly within the overlap between habeas and § 1983. Leamer could not have brought this claim as a habeas claim; he did not and could not seek earlier release based on the adjudication of his constitutional claims.[7] The Court also erred in concluding that the possibility that parole would be delayed if he remained on RAP status would be sufficient to trigger a Balisok analysis.
 
 
 27
 We are bolstered in our conclusion by the analysis undertaken by other Courts of Appeals. The Second Circuit Court of Appeals recently engaged in a thorough review of each of the Preiser-Spencer decisions, including the concurrences and dissents, and concluded that "nothing in Supreme Court precedent requires that the Heck rule be applied to a challenge by a prisoner to a term of disciplinary segregation." Jenkins v. Haubert, 179 F.3d 19, 27 (2d Cir.1999). Accordingly, it held that a § 1983 suit that challenges "the validity of a disciplinary or administrative sanction that does not affect the overall length of the prisoner's confinement is not barred by Heck and Edwards." Id.; see also Brown v. Plaut, 131 F.3d 163 (D.C.Cir.1997). The Seventh Circuit Court of Appeals, in choosing to follow Jenkins (overruling its earlier, broader reading; see Stone-Bey v. Barnes, 120 F.3d 718 (7th Cir.1997)), noted the inapplicability of habeas to the facts of the prisoner's claim before it: "Unlike the plaintiffs in Preiser, Heck, and Edwards, Mr. DeWalt's case does not `lie at the intersection' of sections 2254 and 1983. Mr. DeWalt does not challenge the fact or duration of his confinement, but only a condition of his confinement-the loss of his prison job. Consequently, under our precedent, Mr. DeWalt may not pursue a habeas action." DeWalt v. Carter, 224 F.3d 607, 617 (7th Cir.2000).
 
 
 28
 Here, as in DeWalt, the challenge by Leamer is aimed at a condition of his confinement, and is a challenge properly brought under § 1983. Whether the RAP status is invalidated is immaterial to the propriety of the § 1983 claim. The operative test under Preiser and its progeny is not whether Leamer would, if successful, be able to appear before the Parole Board. It is whether a favorable determination of Leamer's challenge would necessarily imply that he would serve a shorter sentence, which, as the District Court recognized, would not be the case. In fact, elsewhere in its opinion, the District Court noted: "the situation of inmates incarcerated at ADTC is unique in that their eligibility for parole is directly linked to their progression in therapy. Unless an inmate/patient is `cured' he will serve the maximum sentence."
 
 
 29
 The District Court concluded that this characteristic is what brought Leamer's case squarely within Balisok; actually, as we see it, this is what squarely distinguishes it from Balisok. Whatever the decision on the § 1983 claim, Leamer's release date will not change; it is precisely because he does not "earn credits" to which he can claim entitlement that his RAP status does not determine the date of release. In considering a challenge to Hawaii's sex offender program, the Ninth Circuit Court of Appeals wrote:
 
 
 30
 The only benefit that a victory in this case would provide Neal and Martinez, besides the possibility of monetary damages, is a ticket to get in the door of the parole board, thus only making them eligible for parole consideration according to the terms of their sentences. If Neal and Martinez win, it will in no way guarantee parole or necessarily shorten their prison sentences by a single day. The parole board will still have the authority to deny the inmates' requests for parole on the basis of any of the grounds presently available to it in evaluating such a request. A victory in this case would not alter the calculus for the review of parole requests in any way. Because the inmates' challenge in this case does not necessarily imply the invalidity of their convictions or continuing confinement, it is properly brought under § 1983.
 
 
 31
 Neal v. Shimoda, 131 F.3d 818, 824 (9th Cir.1997). This reasoning conforms with the way we have previously viewed § 1983 relief in this context. In 1985, with only Preiser as guidance, we stated that "the fact that a prisoner's success in the litigation might increase the chance for early release does not, in itself, transform the action into one for habeas corpus. Georgevich does not ask for release on parole, but merely seeks uniform application of due process procedures to all members of the class." Georgevich v. Strauss, 772 F.2d 1078, 1087 (3d Cir.1985). Following the Supreme Court's decision in Heck, in Smith v. Holtz, we again clarified that the critical initial question in determining whether habeas or § 1983 is appropriate is whether the claim truly lies "at the intersection." It does if — but only if — the claim would necessarily imply the invalidity of a conviction. 87 F.3d 108, 113 (3d Cir.1996) (applying Heck to bar a § 1983 challenge to a pending criminal charge).
 
 
 32
 As we clarify today, the propositions in these cases are unchanged. When examining whether Preiser and its progeny require a claim to be brought under habeas, unless the claim would fall within the "core of habeas" and require sooner release if resolved in the plaintiff's favor, a prison confinement action such as this is properly brought under § 1983. Leamer's claim not only does not fall within the core of habeas; it would not be properly brought under habeas at all. Conversely, it was properly brought under § 1983.
 
 
 VI. Constitutional Claims
 
 
 33
 Leamer has alleged violations of procedural due process, substantive due process, and the Eighth Amendment proscription against cruel and unusual punishment. Because the District Court read Balisok as foreclosing Leamer's claims in their entirety, it never fully analyzed whether Leamer has posited a sufficiently fundamental liberty interest to implicate these guarantees under the Eighth and Fourteenth Amendments. In fact, the sole reference in the opinion to Leamer's liberty interest is: "Even assuming Plaintiff has a liberty interest in being afforded therapy, a § 1983 claim for damages cannot be brought...." While the facts will necessarily animate these claims, we note that we view the unique statutory scheme present here, and the essential right to treatment inherent in it, as presenting the type of liberty interest that is at the heart of procedural and substantive due process, and that could support a finding that a total denial of treatment constitutes cruel and unusual punishment.
 
 
 34
 The United States Supreme Court has repeatedly recognized that civil commitment procedures may implicate fundamental liberty interests. See, e.g., Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); Vitek v. Jones, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980); Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); Foucha v. Louisiana, 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). Leamer has not been civilly committed. He has been detained by the state because he has broken its laws. But here, confinement and treatment are inextricably linked. We note in this regard that Leamer's claim of a liberty interest that was created by New Jersey's sentencing of him under a statutory scheme that predicates the term of his sentence on his response to treatment is somewhat unique. The sentencing court has classified Leamer as having a "mental aberration" and in need of "specialized treatment." That assessment has automatically subjected him to the maximum incarceration permitted by law unless he is cured prior to that point. Neither good behavior, parole policies, or other credits can affect the term of his sentence. Only successful therapy can shorten his incarceration. Therapy is thus an inherent and integral element of the scheme, and its deprivation is clearly a grievous loss not emanating from the sentence. Thus, we must analyze each of the three constitutional guarantees asserted, asking:
 
 
 35
 I. Whether Leamer had a liberty interest in treatment that was implicated for purposes of procedural and substantive due process.
 
 
 36
 II. Did the procedures employed in denying treatment comport with due process?
 
 
 37
 III. Was the denial of treatment deliberately indifferent and so arbitrary as to shock the conscience for purposes of substantive due process? IV. Were the correctional authorities "deliberately indifferent" to Leamer's treatment needs for the purposes of the an Eighth Amendment analysis?
 
 
 38
 The record before us is such that we can and will answer the first question, but we will only discuss the nature of the inquiry as to the remaining questions, deferring an individualized analysis of the specific constitutional rights until the factual record has been further developed in the District Court on remand.
 
 
 A. The Nature of Leamer's Liberty Interest
 
 
 39
 In Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court, addressing a procedural due process claim, held that in defining which liberty interests created by state law warrant due process protection, we must assess the "nature" of the interest and whether its deprivation caused the inmate to suffer "a `grievous loss' of liberty retained even after ... imprisonment." Id. at 480, 115 S.Ct. 2293 (quoting Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). Sandin further clarifies that the state-created interests would "be generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 484, 92 S.Ct. 2593.
 
 
 40
 Here, the state has created a scheme in which therapy is both mandated and promised, and the Department of Corrections is without discretion to decline the obligation.
 
 
 41
 The Commissioner has an affirmative duty to treat defendant. It is not conditioned on defendant's ability to fit into a particular modality. If the present operation at A.D.T.C. is unable to meet his needs, the Commissioner has a responsibility to formulate and implement a policy which will.
 
 
 42
 State v. Harvey, 162 N.J.Super. 386, 392 A.2d 1248, 1251 (N.J.Super. Ct.L.Div. 1978), aff'd. 170 N.J.Super. 391, 406 A.2d 724 (N.J.Super.Ct.App.Div. 1979). The state has further recognized that the treatment requirement is distinct from the traditional scheme of incarceration by requiring the state to resentence prisoners to whom it will not provide treatment. Gerald v. Comm., N.J. Dept. of Corr., 102 N.J. 435, 508 A.2d 1113 (N.J.1986); State v. Cruz, 125 N.J. 550, 593 A.2d 1169, 1171 (N.J. 1991). The court noted further that, since treatment rather than punishment was the goal of the Act, a lack of treatment could not "be justified by distinguishing his condition because he has been sentenced for a criminal offense and not been adjudicated insane or mentally incompetent." 392 A.2d at 1252. We conclude that Leamer's liberty interest in treatment is fundamental and cognizable for purposes of both the procedural and substantive due process analyses.
 
 
 B. Procedural Due Process
 
 
 43
 The District Court expressly concluded that Leamer's right to procedural due process "appears to be without merit." The Court based its conclusion on the numerous reviews that occurred while Leamer was on RAP status, "several" of which he attended.[8] In his first cause of action, Leamer alleges violations of procedural due process, primarily as to the denial of therapy, but also as to the nature of the reviews of his RAP status. However, the record before the District Court, and before us, is wholly inadequate to determine what, if any, process was used to determine that Leamer's therapy should be denied to him.[9]
 
 
 44
 Leamer also asserts that he was denied "effective and meaningful reviews of his assignment to RAP by not allowing him to know the contents of institutional reports (such as custody, Internal Affairs Unit, or therapist reports), even summarily to thereby enable Plaintiff to make a defense or conform thereto." To the extent that Leamer is alleging that the placement on RAP status was itself a violation of procedural due process rather than that his maintenance on RAP wrongfully and arbitrarily deprived him of therapy or that the reviews were faulty because they claimed to be therapeutic and clinical but were not, Leamer could face significant obstacles in establishing this claim. Under Sandin, the mere fact of placement in administrative segregation is not in itself enough to implicate a liberty interest; the liberty interest only exists if that placement is an "atypical and significant hardship" relative to others similarly sentenced. Thus, under Sandin a court must assess whether administrative segregation, or its concomitant conditions, constitute an "atypical and significant hardship" by comparing the circumstances of Leamer's placement with those of others within comparable confinement to determine if they are "within the expected parameters of the sentence imposed by a court of law." 515 U.S. at 484, 115 S.Ct. 2293; see also Griffin v. Vaughn, 112 F.3d 703, 708 (3d Cir.1997) (applying Sandin).
 
 
 C. Substantive Due Process
 
 
 45
 "[T]he Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions `regardless of the fairness of the procedures used to implement them.'" Foucha v. Louisiana, 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (quoting Zinermon v. Burch, 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990)). Leamer's allegations that his substantive due process rights were violated were not analyzed by the District Court, and the District Court will need to develop the record in order to assess these claims on remand. Analysis of the deprivation of substantive due process is never an easy task, and this fact pattern presents no exception. The first step in the analysis is to define the "exact contours of the underlying right said to have been violated." County of Sacramento v. Lewis, 523 U.S. 833, 842 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). We have attempted to assist the District Court in this process by clarifying the liberty interest that is at stake here. Typically, when what is at issue is executive action, we must ask whether the officials have been deliberately indifferent to a liberty interest and deprived the plaintiff of that interest in such a way that the "behavior of the governmental officer is so egregious, so outrageous that it may fairly be said to shock the contemporary conscience." Id. at 847 n. 8, 118 S.Ct. 1708. As we have indicated, the due process right to treatment here was not a matter of Leamer's health or well-being. Rather, the indifference analysis must focus on the challenged abuse of power by officials in denying Leamer the treatment regimen that was statutorily mandated and was necessary in order for his condition to improve, and thus for him to advance toward release.
 
 
 46
 The assessment of what constitutes conscience-shocking behavior differs according to the factual setting. The Supreme Court has noted that, in the prison setting, the opportunity for deliberation may make the test more easily satisfied than in, for example, the setting of a police chase. In contrast, under rapidly evolving situations requiring immediate responses from personnel, such as the high-speed chase that was at issue in Lewis, there can be no liability without an "intent to harm suspects physically or to worsen their legal plight." 523 U.S. at 854, 118 S.Ct. 1708. But "deliberate indifference" is "sensibly employed only when actual deliberation is practical, and in the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare." Id. at 851, 118 S.Ct. 1708 (citations omitted). As discussed in Lewis, here the persons responsible for Leamer's treatment had "time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations. When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." Id. at 853, 118 S.Ct. 1708. Here, the authorities were not merely supposed to reflect and care, but in addition were to carry out a prescribed course of treatment. Thus, on remand, the District Court will need to develop and examine the record to determine whether Leamer was deprived of treatment in a way that was deliberately indifferent and that "shocks the conscience" under Lewis.
 
 
 47
 
 D. Eighth Amendment and Deliberate Indifference to Treatment Needs
 
 
 
 48
 Relying on [Victor] Torres v. Fauver, see supra n. 3, the District Court concluded that Leamer's Eighth Amendment claims were without merit because the conditions of the segregated detention were not "severe or unwarranted deprivation" sufficient to constitute cruel and unusual punishment. But we think that conclusory assessment essentially disregards Leamer's allegations. He claims that the prison authorities were deliberately indifferent to his physical and mental well-being by his strict confinement and denial of treatment. As with the other constitutional claims, this claim is fact-intensive and will require further development of the record. In Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court stressed that pro se complaints are to be read liberally. The District Court should dismiss the complaint for failure to state a claim only if it appears beyond doubt that Leamer can prove no set of facts in support of the claim that would entitle him to relief. See id. In Estelle, the Supreme Court established the deliberate indifference standard as appropriate in Eighth Amendment prisoner cases, focusing on the treatment provided, and concluding there that the alleged indifference was a matter of medical judgment that did not implicate principles of cruel and unusual punishment. Id. at 107, 97 S.Ct. 285. In contrast, in Buckley v. Rogerson, 133 F.3d 1125 (8th Cir.1998), the Court of Appeals for the Eighth Circuit held the prisoner's allegations sufficient to state an Eighth Amendment claim where his segregation and "treatment" were dictated by correctional, non-medical staff, and a doctor opined that the actions taken would exacerbate a condition such as Buckley's. In Lair v. Fauver, 595 F.2d 911 (3d Cir.1979), we confronted similar claims by a prisoner sentenced under the same provisions as Leamer who was, in that instance, complaining of a deprivation of treatment arising from his transfer to another institution. There, we urged the district court to assess "whether Lair can adduce facts that would establish that the prison authorities' conduct with respect to his alleged need for psychological treatment constituted' deliberate indifference' to a serious illness or injury and `wanton infliction of unnecessary pain,' `repugnant to the conscience of mankind,' so as to violate the eighth amendment under the standards laid down in Estelle v. Gamble."[10] (citations omitted). Id. at 914 n. 11. Because of the paucity of the record before us and the need for an assessment and understanding of the treatment required and prescribed, we cannot say that such a demonstration of deliberate indifference based on a failure to provide treatment is "beyond doubt" at this stage, and we likewise remand for further consideration.
 
 
 VII. Conclusion
 
 
 49
 For the reasons stated above, we will REVERSE the dismissal of the complaint by the District Court and REMAND for further proceedings consistent with this Opinion.
 
 
 
 Notes:
 
 
 [1]
 This language precisely replicates one of four reasons for placing an inmate on Close Custody StatusSee N.J. Dep't of Corr. Std. 145.
 
 
 [2]
 In his Complaint, Leamer discusses over 30 reviews that occurred between February 1993 and August 23, 1995. He states specifically that he was present only at the April 20, 1994, December 28, 1994, January 11, 1995 and April 4, 1995 reviews. Counsel substitute was also present at the December 1994 and January 1995 reviews
 
 
 [3]
 In doing so, the District Court followed the reasoning of an opinion from the District of New Jersey, [Victor] Torres v. Fauver, 97-1504 (no citation to reporter, Westlaw, or LEXIS is available). At our request at oral argument, counsel provided copies of the opinion to the panel. Leamer claims that the plaintiff in Torres was sentenced under the 2C provisions, rather than the 2A provisions, and that the case is therefore distinguishable. Although it is not possible to determine from the face of the opinion which sentencing provisions were used, it is not necessary for us to distinguish it on that basis, since we disagree with the reasoning of the Torres court as well.
 
 
 [4]
 The statutory scheme at issue here, designated 2A: 164-3, et seq., was replaced in 1979, shortly after Leamer's conviction, with the current sex offender statutes, 2C: 1-1, et seq. Because both the provisions and the legislative conclusions underlying the statutory scheme of 2C are so different, we expressly decline to consider whether any of the conclusions that we reach with regard to the 2A provisions would be applicable to persons convicted under the 2C provisions. In Appellant's Brief, it is estimated that only 30 prisoners are still serving sentences under 2A's provisions
 
 
 [5]
 InHarvey, the New Jersey Superior Court recognized that an earlier decision, State v. Newton, 17 N.J. 271, 111 A.2d 272 (N.J.1955), had excused lack of treatment due to a lack of adequate facilities and staff. 392 A.2d at 1252. It concluded that courts have since become "more insistent that persons committed involuntarily to our state institutions receive the treatment required" and the lack of facilities and staff is "no longer justification for failure to provide the treatment required." Id.
 
 
 [6]
 The other three are:Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973); Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994); Spencer v. Kemna, 523 U.S. 1, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998).
 
 
 [7]
 While we recognize that some courts of appeals and several district courts have agreed with this extension ofPreiser and its progeny, we respectfully disagree. The Tenth and Sixth Circuit Courts of Appeals have stated the proposition expressly in a series of unpublished opinions. See also Friedland v. Fauver, 6 F.Supp.2d 292, 309 (D.N.J. 1998)("[T]he Supreme Court extended Heck by holding that a prisoner's § 1983 action challenging a prison disciplinary sanction and seeking `declaratory relief and money damages, based on allegations of deceit and bias on the part of the decisionmaker that necessarily imply the invalidity of the punishment imposed, is not cognizable under § 1983' unless the disciplinary sanction has been overturned or invalidated.")
 
 
 [8]
 In his complaint, Leamer alleges that after the initial placement on RAP in February 1993, he was not present at any of the monthly reviews except in April 1994, December 1994, and January 1995, the latter two with a paralegal
 
 
 [9]
 The record before us is the more confusing because the state has changed its position on this issue. Before the District Court — and relied on by the District Court in its opinion — the state argued that the denial of therapy was justified. Before us, however, both in the briefs and at oral argument, the state has argued that RAP status was a form of therapy, and that therapy was never denied. Leamer has alleged that he did not receive therapy, except on a few isolated occasions when he was escorted to group sessions, and that, although, notations appear that indicate that therapists' reports were submitted to the committee reviewing his RAP status, those reports, if they existed, were generated without any contact, either therapeutic or evaluative, with Leamer. We note that under both Supreme Court and our own precedent,pro forma reviews that were not based on actual evaluations of Leamer's clinical condition and progress would be violations of procedural due process. See, e.g., Foucha v. Louisiana, 504 U.S. 71, 79, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992); Parham v. R., 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979); Sourbeer v. Robinson, 791 F.2d 1094, 1101 (3d Cir.1986); Clark v. Cohen, 794 F.2d 79, 86 (3d Cir.1986).
 
 
 [10]
 As we stated earlier, the dismissal of Fauver individually and of Leamer's claim to equal protection and his ex post facto state law claims has not been argued on appeal; accordingly, we will not disturb the District Court's dismissal of these claimsNegron-Gaztambide v. Hernandez-Torres, 35 F.3d 25, 28 (1st Cir.1994).